UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert Louis BEASLEY, Jr., a/k/a "Dan Israel," Rufus Pace, Sr., a/k/a "Ahaz Israel," Ernest Lee James, a/k/a "Ahinadad Israel," Richard Ingraham, a/k/a "Job Israel," Linda Gaines a/k/a "Judith Israel," Walter Lightburn, a/k/a "Amri Israel," Yahweh Ben Yahweh f/k/a "Hulon Mitchell, Jr.," a/k/a "Hulon Shah," & "Moses Israel," Defendants–Appellants.

No. 92–4773.

United States Court of Appeals,
Eleventh Circuit.

Jan. 5, 1996.

Albert Z. Levin, Miami, FL, for Beasley.

Michael G. Smith, Fort Lauderdale, FL, for Pace.

Clayton Kaeiser, Miami, FL, for James.

Mark Graham Hanson, Miami, FL, for Ingraham.

Paul A. McKenna, Coconut Grove, FL, for Gaines.

Steven H. Kassner, Coral Gables, FL, for Lightburn.

Benedict Kuehne, Miami, FL, for Yahweh.

Kendall Coffey, U.S. Attorney, Lisa Rubio, Linda Collins Hertz, Albert Jordan, Miami, FL, for appellee.

Before EDMONDSON and DUBINA, Circuit Judges, and CUDAHY *, Senior Circuit Judge.

PER CURIAM:

In a superseding indictment, a federal grand jury in the Southern District of Florida charged appellants Robert Louis Beasley, Jr. ("Beasley"), Rufus Pace, Sr. ("Pace"), Er-

---

* Honorable Richard D. Cudahy, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

nest Lee James ("James"), Richard Ingraham ("Ingraham"), Linda Gaines ("Gaines"), Walter Lightburn ("Lightburn"), Yahweh Ben Yahweh ("Yahweh"),[1] and 12 codefendants with a RICO conspiracy, under 18 U.S.C. § 1962(d) (count I). Count I listed 19[2] racketeering acts of murder, extortion, and arson. Appellants Yahweh, Gaines, Lightburn, Beasley, James, Pace, and five codefendants were also charged with a substantive RICO count under 18 U.S.C. § 1962(c) (count II). Count III charged appellants Yahweh and Gaines with extortion under 18 U.S.C. § 1951.

After a trial that lasted approximately five months, appellants were found guilty of the RICO conspiracy (count I). The jury acquitted Pace, James, and Beasley of count II. Yahweh, Gaines, Lightburn and Ingraham received mistrials as to count II. Appellants filed various opposed post-trial motions which were all denied.

The appellants were all sentenced pre-guidelines.[3] Gaines and Ingraham were each sentenced to 16 years' imprisonment and a $5,000.00 fine. Beasley was sentenced to 15 years' imprisonment and a $5,000.00 fine. Pace received a 15½ year sentence and a $5,000.00 fine. Lightburn and James were each sentenced to 16½ years in prison and a $5,000.00 fine. Yahweh was sentenced to 18 years' imprisonment and a $20,000.00 fine. Appellants then perfected this appeal.

## I. BACKGROUND FACTS

In 1979, Yahweh and Gaines moved to Miami, Florida, and laid the foundations for a religious cult later to be known as the "Yahwehs" or "Black Hebrew Israelites." Yahweh taught that blacks are the true Jews, that God and Jesus are black, and that he had been chosen by "the Terrible Black God, Yahweh" to lead blacks from years of oppression to the promised land of Israel.

Yahweh's followers were required to give up their legal or slave names and to adopt Hebrew names, all of which had a last name of Israel. Societal norms were discarded as Yahweh established his own laws, which were purportedly based upon the Bible. Yahweh's followers grew, and by late 1980, he had the financial means to buy a building in Miami known as the "Temple of Love." Many of Yahweh's followers chose to be full-time workers who were required to give all of their possessions to the Temple. Businesses were established inside the Temple, including a printery, a grocery store, and a beauty salon.

Between late 1981 and 1982, Yahweh instituted profound changes in the administration of the Yahweh religion. First, Yahweh announced that he was the son of God and renamed himself Yahweh Ben Yahweh (God, the son of God). He encouraged his followers to break from the "immoral world" and to give up their outside jobs and move into the Temple. Clothing changed from street clothes to African apparel and then to white robes and turbans. Yahweh taught his followers to avoid their birth families, because they were not "true" families.

When Yahweh's followers moved into the Temple, families were often separated. Tight security was established at the Temple; all who entered were searched. Yahweh established a trusted group of male bodyguards called the "Circle of Ten" who protected Yahweh and stood guard at all Temple entrances with 5 to 6 foot wooden staffs, swords, or machetes. Yahweh taught that uninvited entrants to the Circle would lose their lives.

Gaines became Yahweh's companion and "right hand man." Among her duties, Gaines collected money and possessions from full-time workers and handled the Temple's finances. Gaines had special privileges, including a bodyguard. Yahweh sought to

---

1. The record shows that Yahweh Ben Yahweh has been called by a number of names throughout his lifetime. Although his birth name is Hulon Mitchell, Jr., he rejects that name as a slave name. For clarity's sake, we follow the practice in the district court and refer to this defendant as "Yahweh."

2. Count I originally contained 19 racketeering acts; however, the government dismissed racketeering act 6 prior to trial, and the district court dismissed racketeering act 19 and count III pursuant to Federal Rule of Criminal Procedure 29.

3. The United States Sentencing Guidelines ("U.S.S.G.") became effective November 1, 1987.

spread his influence nationally by sending out specially trained and trusted elders to establish satellite temples, distribute Yahweh literature, and spread his teachings. Between 1982 and 1985, temples were established by a group of 40 or so elders in several large metropolitan areas in the United States.

Between 1981 and 1984, Yahweh's power and influence grew, as did the Temple's finances. Yahweh demanded total loyalty and almost total control of the members' lives, which he achieved by "teaching against" members who disagreed with or failed to follow his spiritual teachings. Yahweh forced dissidents to stand at meetings and openly face his ridicule. He directed cult members to administer severe beatings to those who violated his rules. Followers feared for their lives if they did something wrong, spoke out against Yahweh, or left the Temple. In an effort to totally control his followers, Yahweh carefully regulated their food, sleep, and medical care. All members were required to work long hours to further the Temple's financial interests. Although Yahweh preached brotherly love, he also directed members to commit murder. Yahweh required that his followers publicly state that they would die and kill for God Yahweh, two requirements that he routinely propounded in teaching sessions, during which the members literally shouted in unison their willingness to do so.

As Yahweh's power and influence continued to grow, his teachings became black supremacist and violently racist. Yahweh prophesied war between the black and white races and called "white America" a country cursed by God Yahweh and harboring God's enemies. Yahweh taught that one day, his group would chase white men, whom he referred to as "white devils," from the face of the earth by killing them. Yahweh referred to God Yahweh as a "Terrible Black God" of war and violence and taught that death to his enemies would be at the hand of his "death angels."

At Yahweh's direction, many murders and attempted murders in the Miami area occurred. One of the most violent members of the group, Robert Rozier ("Rozier"),[4] testified at trial that an ultra-secret group called the "Brotherhood" was established within the cult. This group was to perform any task that Yahweh directed, including murder. Yahweh conducted separate meetings for Brotherhood members, which were to be kept secret under penalty of death. Among those present at Brotherhood meetings were Rozier and defendants Dexter Grant, Pace, Beasley, Ingraham, Maurice Woodside, James, Yahweh, and sometimes Gaines. To become a member of the Brotherhood, one had to kill a white person and bring proof of the kill to Yahweh in the form of a head, an ear, or some other body part. Between April and October 1986, Yahweh sent his death angels into the Miami community on multiple occasions to kill white people randomly and to commit acts of retribution against blacks who interfered with the Yahwehs' sales of products and collection of donations. Yahweh also directed the killings of white people as retribution for 400 years of oppression and for specific acts of alleged police brutality against blacks occurring at the time.

At the trial of this case, Yahweh took the stand and testified in his own behalf. Additionally, Ingraham called Paul George ("George"), a historian, as an expert witness to testify that the Yahweh religion is a true religion.

We now briefly summarize each racketeering act.

*Racketeering Act 1: Attempted Homicide of Eric Burke.*

When Burke broke away from the group, Yahweh preached that he should be killed. The plan failed, however, notwithstanding Yahweh's directions to his followers to get machetes and "roll Burke's head."

*Racketeering Act 2: Homicide of Aston Green.*

Green was a member of the cult who attempted to leave. Green returned to the Temple to retrieve his Bible, at which time he was taken to a back room where 10 or so

---

**4.** Rozier was the key witness for the government. The record demonstrates that he attended college at Berkeley in California, but did not complete his education there because he was drafted by the St. Louis Cardinals to play professional football in the National Football League.

members beat him almost to the point of death. Semiconscious, Green was taken to a remote construction area by Ingraham, John Foster, and Ricardo Woodside, where Green, still alive, was decapitated with a machete. Upon learning of the murder, Yahweh was delighted and worked the crowd in the Temple into a frenzy where they all stood and clapped.

*Racketeering Acts 3 and 4: Homicide of Carlton Carey; Attempted Homicide of Mildred Banks.*

Carey was shot several times and died at the scene. Banks was also shot, and she sustained a deep gash in her neck during an attempt to decapitate her with a machete. She survived but was unable to identify her assailants.

*Racketeering Act 5: Homicide of Leonard Dupree.*

Because Dupree was known to be a karate expert, Yahweh openly challenged him to fight Lightburn, the Yahwehs' resident martial arts expert. The two men squared off in front of about 30–60 Yahweh onlookers. Dupree quickly knocked Lightburn down, at which point Yahweh ordered all present, including Ingraham and Maurice, to attack Dupree. Ingraham struck Dupree in the face with a tire jack. Dupree was literally beaten to death. During the struggle, Gaines locked the doors of the Temple at Yahweh's request. Yahweh allowed no one to leave and made everyone, including children, strike and kick Dupree's lifeless body. Dupree's body has never been found.

*Racketeering Acts 7 and 8: Homicides of Glendell Fowler and Kurt Doerr.*

Yahweh told Rozier (who murdered six people at Yahweh's direction) to kill a white devil, cut his head off, and become a son of God Yahweh. Rozier walked around the Coconut Grove area of Miami, spotted an intoxicated white man, followed him into an apartment, told the man he was an angel of Yahweh, and then stabbed him to death. Upon leaving the apartment, Rozier noticed a second white man inside the apartment. Rozier also stabbed him to death.

*Racketeering Act 9: Delray Beach Arson.*

The people in the Delray Beach neighborhood of Miami had attacked several of the Yahweh members. Yahweh selected 15–20 people to firebomb the area so that similar incidents would not occur in the future. An altercation occurred between the residents of the area and the Yahwehs. Notwithstanding the fact that the police arrived, the Yahwehs threw dozens of firebombs. Yahweh ordered the arsonists to stand in front of the residences and use their swords and machetes to murder anyone who tried to exit the burning houses. The residents were too terrified to come out and face Yahweh's "death angels."

*Racketeering Act 10: Homicide of Clair Walters.*

Walters was found in an abandoned hotel with his throat cut and his left ear removed. Yahweh member Ardmore Canton later showed Rozier the ear that he had cut from Walters's lifeless body.

*Racketeering Act 11: Homicide of James Myers.*

James M. Littlejohn ("Littlejohn") told Rozier about killing a white man. Littlejohn said that he had been taught by Yahweh to stab the victim in the kidney area to cause the victim to go into shock. When police found Myers, he had been stabbed in the back and kidney area, and although both ears had been cut, neither had been severed from his body.

*Racketeering Act 12: Homicide of Lyle Austin Bellinger.*

Carl Douglas Perry ("Perry") told Rozier that he had killed a white man who had been wearing a Star of David tee shirt sold by the Yahwehs. Perry stabbed the victim several times after which the victim fled and fell near a canal. The police found the body of a white man, Bellinger, lying near a canal.

*Racketeering Act 13: Homicide of Raymond Kelly.*

Yahweh ordered Rozier and Perry to kill several white devils during a single night in September 1986. They rode the metrorail south and followed potential victims in Coconut Grove before walking south to the University of Miami in Coral Gables. Rozier and Perry later found two white victims

whom they stabbed to death, severing both ears from one of the victims.

*Racketeering Act 14: Homicide of Cecil Branch.*

Branch was stabbed over two dozen times, and one of his ears was severed. The police found Branch face down on the floor of his house; he was bound and gagged with strips of bed sheets. A latent fingerprint on the frame of Branch's front door matched Rozier's prints.

*Racketeering Act 15: Homicide of Harry Byers.*

Anthony Murphy ("Murphy") had never killed a white devil and decided that he would look for a white child, thinking a child would be easier to kill than an adult. Instead, he found Byers, whom he stabbed several times in the abdomen before cutting off his left ear.

*Racketeering Act 16: Homicide of Reinaldo Echevarria.*

Brian K. Lewis ("Lewis") stabbed and killed Echevarria, a white Cuban male, but sustained severe injuries himself when his hand slid down the knife blade during the stabbing. Lewis almost lost his fingers, but they were saved through surgery. Echevarria had been stabbed so severely that medical experts described the murder as "overkill."

*Racketeering Acts 17 and 18: Homicides of Anthony Brown and Rudy Broussard.*

In October 1986, the Yahwehs tried to buy an apartment complex located in Opa Locka, Florida, which consisted of five buildings occupied by drug dealers and families with several children. Brown and Broussard stood up to the Yahwehs, at which time Yahweh ordered Rozier and Perry to kill them. Both were later shot in the head at point-blank range.

## II. STATEMENT OF THE ISSUES

The following issues are presented by the appellants on appeal:

(1) whether the evidence was sufficient to prove a RICO conspiracy;

(2) whether the evidence was sufficient to support Yahweh's conviction;

(3) whether the evidence was sufficient to support Gaines's conviction;

(4) whether the district court properly admitted evidence of Yahweh beliefs and practices;

(5) whether the district court improperly allowed the injection of racism at trial;

(6) whether the appellants are entitled to have their convictions reversed based on alleged prosecutorial misconduct;

(7) whether alleged *Brady* [5] violations deprived the appellants of a fair trial;

(8) whether expert testimony of Rozier's psychopathic tendencies was properly excluded;

(9) whether the district court erred in its supplemental instructions to the jury;

(10) whether the district court properly admitted a co-conspirator statement incriminating Pace; and

(11) whether the district court abused its discretion in excluding James from the trial.

## III. STANDARDS OF REVIEW

Sufficiency of the evidence is a question of law subject to *de novo* review. This court views the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor. We need only find "that a reasonable fact-finder could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Keller,* 916 F.2d 628, 632 (11th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).

 The district court's evidentiary rulings are not subject to reversal absent a clear abuse of discretion. The court's discretion to exclude otherwise relevant evidence under Federal Rule of Evidence 403 is limited; relevant evidence may be excluded only when its probative value is substantially outweighed by the danger of unfair prejudice. "Even where an abuse of discretion is shown,

---

5. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." *United States v. Sellers,* 906 F.2d 597, 601 (11th Cir.1990).

Prosecutorial misconduct is a basis for reversal only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused. *United States v. Obregon,* 893 F.2d 1307, 1310 (11th Cir.), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). The district court's conclusion that no *Brady* violation occurred is subject to de novo review by this court. *See Delap v. Dugger,* 890 F.2d 285, 298–99 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). The exclusion of expert testimony is subject to the abuse of discretion standard. *United States v. Cameron,* 907 F.2d 1051, 1061 (11th Cir.1990). Appellate review of a district court's decision to give an *Allen*[6] charge is limited to evaluating the coercive impact of the charge. *United States v. Elkins,* 885 F.2d 775, 783 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

When the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism. An erroneous instruction does not require reversal unless this court is left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations. *United States v. Weissman,* 899 F.2d 1111, 1114 n. 1 (11th Cir.1990). In addition, this court gives deference to the district court's exclusion of a defendant from the courtroom pursuant to Federal Rule of Criminal Procedure 43. *United States v. Kizer,* 569 F.2d 504, 506–07 (9th Cir.), *cert. denied,* 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978); *see also Foster v. Wainwright,* 686 F.2d 1382, 1388 (11th Cir. 1982), *cert. denied,* 459 U.S. 1213, 103 S.Ct.

1209, 75 L.Ed.2d 449 (1983) (when considering constitutional claim of denial of right to be present at trial, appellate court gives great deference to a district court decision excluding defendant).

## IV. *ANALYSIS*

### A. *Sufficiency of the Evidence to Prove RICO Conspiracy.*

Appellants were each convicted of violating 18 U.S.C. § 1962(d), which makes it unlawful for any person to conspire to violate a substantive RICO provision. Appellants challenge the required elements of (1) an enterprise, (2) a pattern of racketeering activity, and (3) an effect on interstate commerce.

First, we are persuaded that the government's naming of the Yahweh Nation as the RICO enterprise was proper. Substantial legal precedent permits a wide range of legitimate enterprises to be named as the vehicle through which racketeering acts are committed. *See United States v. Turkette,* 452 U.S. 576, 580, 587, 101 S.Ct. 2524, 2527, 2530, 69 L.Ed.2d 246 (1981); *United States v. Zielie,* 734 F.2d 1447, 1463 (11th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964, *and cert. denied,* 469 U.S. 1216, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985). A variety of entities can be enterprises, including benevolent and nonprofit organizations such as unions and benefit funds, governmental units, courts and judicial offices, police departments, and motorcycle clubs to name a few.

Second, we are convinced that the government properly proved a pattern of racketeering by showing the required relatedness and continuity of the criminal acts as well as the required relationship between the racketeering acts and the enterprise. In order to prove the required two predicate acts, the government must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989). The acts were related in that they all revolved around the simple purposes of silenc-

---

6. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

ing dissention, retaliating for community resistance, and making the "death angels" a reality. The acts showed the required continuity, because they continued over an approximately five-year period. The acts also affected the enterprise and/or the enterprise facilitated the racketeering activities. The racketeering acts affected the Temple by eradicating dissention, eliminating opposition from the community, and confirming the members' belief in "death angels" and Yahweh's prophecies. The acts bolstered members' morale and commitment to the group and reinforced the members' hostility to the outside community.[7]

 Third, the appellants assert that the government did not prove that the predicate acts affected interstate commerce. To satisfy the interstate commerce requirement, only a slight effect on interstate commerce is required. *See, e.g., United States v. Norton,* 867 F.2d 1354, 1359 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701, *and cert. denied,* 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). The testimony at trial was undisputed that the Yahweh Nation reached out to other states and indeed to other countries in an attempt to spread its influence. Yahweh publications and tapes were distributed throughout the United States in Yahweh trucks or by mail and were sent to foreign countries. Given this concerted effort to establish national and international influence and the Yahweh membership's extensive travel in interstate commerce, the effect of the Nation on interstate commerce is more than "slight."

### B. Sufficiency of the Evidence to Support Yahweh's Conviction.

 Our review of the record convinces us that the evidence presented at trial was more than sufficient to support Yahweh's conviction for RICO conspiracy. The government proved that Yahweh agreed to the commission of two or more predicate acts. While he did not commit the acts personally, he ordered his followers to commit numerous acts of murder, secure in the knowledge that his orders would be carried out. The jury properly rejected his argument that the government merely showed his innocent association with the enterprise.

 It is well settled that in order to establish a defendant's involvement in a RICO conspiracy, the government need only prove that a defendant, by his words or actions, objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity, i.e., the commission of at least two racketeering acts. *United States v. Fernandez,* 797 F.2d 943, 950 (11th Cir.1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987); 18 U.S.C. § 1961(1)(A). The government met its burden.

### C. Sufficiency of the Evidence to Support Gaines's Conviction.

 The government overwhelmingly proved Gaines's involvement in the conspiracy. The government offered proof that she was aware of the basic structure and purpose of the enterprise, agreed to the commission of the predicate acts, and, by her actions, nurtured to fruition the acts of the other co-conspirators. Gaines not only was privy to the ultra-secret workings of the Brotherhood, but also sought to facilitate the ruthless crimes.

Though Gaines was not involved in many of the racketeering acts, taken in the light most favorable to the government, the government proved, and the testimony was undisputed, that Gaines was Yahweh's "right hand man" and administrator. In addition to a general involvement in the affairs of the Yahwehs, Gaines was specifically involved in several racketeering acts. For example, con-

---

**7.** Not all of the members of the Temple supported or were engaged in the homicidal activities that are the subject of this case. Indeed, not all of the members took Yahweh's fierce injunctions literally. As the hub of the conspiracy, the Brotherhood did follow those injunctions sometimes to the letter; and so did some others. But there is a distinction between the conspirators in this case and the general population of the Temple. We recognize and stress this difference. This case involves a prosecution of specific people for their unlawful conduct. The case is not the prosecution of a religion. The religion had adherents who never became involved in illegal activity and who were not implicated in this conspiracy.

cerning the beating to death of Dupree at the Temple, Gaines was not only present but, at Yahweh's direction, locked the door so that no one could leave the scene. She was also involved in the Delray Beach arson. Yahweh specifically told the arson team that if they needed anything to go to Gaines. Moreover, Gaines was involved in the Opa Locka incident and the coverup after the Delray fire-bombing, and she was the head of public relations for the Temple. Given this wealth of evidence, it is apparent that Gaines was not only privy to the ultra-secret workings of the Brotherhood, but also was aware of numerous other violent activities. By her actions, she sought to facilitate these ruthless crimes and actively worked to dispel any suspicions cast on the Yahwehs.

### D. *Admission of Yahweh Beliefs and Practices.*

■ Appellants argue that the government obtained the convictions in this case by condemning a religion. The district court ruled that evidence of Yahweh teachings was admissible when relevant to the charges in the indictment, but that testimony regarding general teachings of the Yahweh faith was not relevant. The evidence admitted was highly relevant to the jury's understanding of the existence, motives, and objectives of the RICO conspiracy and the means by which it was conducted. Yahweh used the religion as a means of exhorting followers to commit the racketeering acts, and appellants cannot hide behind the general principle that religion is normally inadmissible in court under both the Federal Rules of Evidence and the First Amendment. Although evidence of Yahweh beliefs and practices was damaging to the defense, it was not unfairly prejudicial.

■ A person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution. *United States v. Sun Myung Moon,* 718 F.2d 1210, 1233 (2d Cir. 1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984); *see also United States v. Reme,* 738 F.2d 1156, 1159–60 (11th Cir.1984), *cert. denied,* 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); *United States v. Mills,* 704 F.2d 1553 (11th Cir.1983),

*cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).

■ It seems clear from the record that the Yahweh religion was not on trial. The evidence regarding the religion was relevant, because religious teachings were used to justify, rationalize, and promote crime. Appellants argue strenuously that the contested evidence violated Federal Rule of Evidence 610, which prohibits using religion to impeach a witness's credibility. The appellants' argument is misguided. The government agrees that it would have been improper to attack witnesses' credibility with their religious beliefs by suggesting that, because of those beliefs, their testimony was untrustworthy. *See United States v. Sampol,* 636 F.2d 621, 666 (D.C.Cir.1980). However, in this case, the government inquired into Yahweh practices and beliefs in an effort to show the background of the RICO enterprise, which the defendants used to carry out acts of murder and arson. The evidence was relevant to show how Yahweh exerted influence and control over the members and how he used his preachings to justify heinous crimes. It is also important to our analysis that Yahweh himself sought to interject religion into his cross-examination by responding to numerous questions with a religious/Biblical response. On direct examination, defense counsel asked Yahweh about his practices and life style, as well as about general Yahweh beliefs. For those reasons, the admission of all of this evidence was not unduly prejudicial under Federal Rule of Evidence 403. Relevant evidence is properly excluded only by a finding that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury...." Fed. R.Evid. 403; *see also United States v. Terzado–Madruga,* 897 F.2d 1099, 1117, 1119 (11th Cir.1990).

■ Finally, it is apparent to us that the Yahweh religion was not on trial, in violation of the First Amendment. The government did not indict the Yahweh religion, but only named it as the racketeering enterprise. The First Amendment's protection of beliefs and associations does not preclude such evidence where relevant to a trial issue. *See*

*United States v. Abel,* 469 U.S. 45, 52–53 n. 2, 105 S.Ct. 465, 469 n. 2, 83 L.Ed.2d 450 (1984). *See also Dawson v. Delaware,* 503 U.S. 159, 165, 112 S.Ct. 1093, 1097–98, 117 L.Ed.2d 309 (1992).

### E. *Injection of Racism at Trial.*

██ Appellants argue that the district court erred in permitting the government to introduce evidence that Yahweh was racist. As previously discussed, however, evidence of Yahweh's racist views not only demonstrated the context, motive, and setup of the crime, but was necessary to complete the story of the charged offenses. *See United States v. Collins,* 779 F.2d 1520, 1532 (11th Cir.1986); *United States v. Williford,* 764 ᵣ' 2d 1493, 1499 (11th Cir.1985). At the very least, Yahweh's racist views and preachings were directly and highly relevant to explain the motive for the "white devil" killings. *See Smalley v. United States,* 798 F.2d 1182, 1188 (8th Cir.1986).

### F. *Alleged Prosecutorial Misconduct.*

██ Appellants argue that they are entitled to have their convictions reversed based on alleged prejudice they suffered at trial due to supposedly improper prosecutorial comments and inadmissible evidence. These arguments are meritless. Taken in context, the majority of the alleged instances were not improper. Even in the instances of improper comments, however, appellants have failed to show that they were prejudiced in light of the district court's rulings and the weight of the evidence. The comments were isolated, not emphasized, and, in the context of the lengthy trial, could not have been prejudicial.

### G. *Alleged Brady Violations.*

██ Appellants argue generally that they were routinely denied *Brady* disclosures in a timely fashion. Specifically, they challenge the prosecution's failure to disclose (1) a proffer written by government witness Rozier; (2) a police report revealing the time of the discovery of Aston Green's body; and (3) latent prints from crime scenes that did not match the defendants' prints. In most of these alleged instances, the information was not *Brady* material. Even where appellants have shown that exculpatory or impeachment information was withheld until trial, however, they have failed to show that, had the information been timely disclosed, a reasonable probability exists that the outcome of the proceedings would have been different. Given this failure, any error would be harmless.

### H. *Exclusion of Testimony of Rozier's Psychopathic Tendencies.*

██ Appellants contend that the district court abused its discretion by not permitting Dr. Barry Crown to testify that Rozier was a psychopath who had no conception of the truth. A district court "has wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974). Absent unusual circumstances, expert medical testimony concerning the truthfulness or credibility of a witness is inadmissible. *See United States v. Wertis,* 505 F.2d 683, 685 (5th Cir. 1974) (per curiam), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). Expert medical testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations. In any event, in the present case, given the extensive cross-examination of Rozier, appellants suffered no prejudice even if we assume the district court's ruling was incorrect.

### I. *Supplemental Jury Instructions.*

██ In this case, the district court gave a modified *Allen* instruction. After only 12 hours of deliberations, the jury advised the court that they were hung. Defense counsel asked the district court to give the pattern modified *Allen* instruction right away, but the district court found it was "a little early" to give an *Allen* charge and told the jury to continue deliberations on counts I and II and to consider and apply all of the court's instructions as a whole. The district court later modified its ruling and gave an *Allen* charge, which amounted to a "toothless tiger." We have reviewed the charge and fail

to see how it could have had any coercive effect upon the jury. The record also demonstrates that after giving the redacted and modified *Allen* instruction, the district court learned of the jury's numerical division. Appellants argue that the *Allen*-type charge given to the jury, combined with the district court's knowledge of the jurors' numerical division, coerced the jury's verdicts. We can reverse only if we find under the totality of the circumstances that either the district court's learning of the numerical division or the giving of the *Allen* charge, or a combination of the two, was *inherently coercive*. *United States v. Chigbo*, 38 F.3d 543, 545 (11th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

Importantly, the district court did not poll the jurors but learned of the numerical division through an unsolicited note from the jury. Second, the district court gave the redacted and modified *Allen* instruction *before* it learned of the jury's division. In *Sanders v. United States*, 415 F.2d 621 (5th Cir.1969)[8], *cert. denied,* 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970), the district court gave a modified *Allen* instruction *after* learning the numerical division of the jurors. The former Fifth Circuit approved the language of the instruction and rejected the defendant's claim that the instruction had been improper merely because the district court had known the jury's numerical division. *Id.* at 631–32. The situation here is easier to decide because the district court's redacted *Allen* charge preceded the note indicating the division of the jurors. In *United States v. Brokemond*, 959 F.2d 206 (11th Cir.1992), we held: "we have ruled that even where the judge undertakes the inquiry into numerical split and thereafter follows it with an *Allen* charge, reversal is unnecessary absent a showing that either action, or a combination of the two actions, was inherently coercive." *Id.* at 210.[9]

### J. Admission of Co–Conspirator Statement Incriminating Pace.

Pace moved *in limine* to exclude the testimony of his former girlfriend, Sharon Saunders ("Saunders"), on the ground that it was hearsay. The government responded that the testimony was admissible as an exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(E). After hearing argument, the district court overruled Pace's objection to Saunders's testimony. During the course of Saunders's cross-examination, the district court gave the jury a Federal Rule of Evidence 801(d)(2)(E) instruction. In our view, Saunders's testimony was properly admitted. *See Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. James*, 510 F.2d 546, 549 (5th Cir.) (en banc), *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975).

Beasley's statement to Saunders implicating himself and Pace in the Carey/Banks incident was in furtherance of the conspiracy. Beasley had used Saunders's gun [10] during the crime and sought to induce her secrecy by telling her that the murder was God Yahweh's will. As such, the statement furthered the conspiratorial objectives. Even if the statement was erroneously admitted, however, Pace's conviction is not entitled to reversal because the alleged error was harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

### K. Exclusion of James From the Courtroom.

James contends that the district court violated his Sixth Amendment right to be present at all stages of the trial by excluding him from the courtroom. Specifically, he argues that the district court's only warning was

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

**9.** We are also persuaded that the appellants have failed to show prejudicial error from the district court's redaction of the original RICO instructions. The modification was made at the govern-

ment's expense and made acquittals more likely. Thus, appellants have shown no grounds for reversal.

**10.** Carey was shot to death with a .32–caliber revolver. Based on the circumstantial evidence, the jury could properly have inferred that the gun used to kill Carey belonged to Saunders.

issued to his lawyer at a time when James was not present, a warning he claims was insufficient as a matter of law. It is undisputed that under Federal Rule of Criminal Procedure 43(b)(2), before excluding a defendant from the courtroom, a district court must warn the defendant to stop misbehaving and inform him that he will be removed if he continues his disruptive conduct. *See Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970). But the factual premise of James's argument— that the district court failed to personally warn him—is contradicted by the record. As evidenced by the comments of counsel and the court, James was present at the competency hearing held on February 24, 1992, (R46:5474, 5476, 5534–37, 5548), at the end of which the court found that James was competent and was "malingering." (R46:5548). With James still in the courtroom, the district court stated:

> And I'm certainly going to accept the offer by [Yahweh] to ask defendant James to straighten up his conduct and assist his counsel if he can. And if he does not do that, I will have little alternative but to invoke the provision of Rule 43(b) and exclude him from the courtroom and the trial and proceed on.
>
> Now, the amazing thing is that a camera was installed in this courtroom as they will be in all the federal courtrooms. . . . [I]t was installed the weekend before this outburst by Mr. James.
>
> So I have the capability now of having Mr. James simply remain in his . . . holding cell downstairs and he can see and observe the trial . . . in case I have to exclude him from the courtroom and he can make notes to his lawyer and we'd have to take perhaps an additional recess . . . before you would make cross examination, and I'm hopeful that . . . these two extra matters . . . will help him.

(R46:5549–50.)

After a recess, the district court, with James again in the courtroom, repeated that it hoped Yahweh could persuade James to behave because it would "hate to exclude him but [didn't] have much choice." (R46:5556.) When James again became disruptive, the district court excluded him with instructions that he be placed "in his cell where he can best see and hear the proceedings" and that James be provided "a pen and pencil [to] permit him to make any notes necessary to furnish to his lawyer . . . at the next recess." (R46:5556–58).

■ As the record makes clear, the district court told James, or at the very least stated in James's presence, that he would be removed under Rule 43(b) if he continued his disruptive behavior. In our view, this warning was sufficient to put James on notice of what might happen if he did not behave. *See United States v. West*, 877 F.2d 281, 287 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *Scurr v. Moore*, 647 F.2d 854, 858 (8th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 670, 70 L.Ed.2d 638 (1981).

■ James's related contention that the district court failed to explore possible alternatives to exclusion is also misplaced. There is no statutory or constitutional requirement that a court try its luck with other sanctions before excluding a disruptive defendant, and we give great deference to the district court's decision that exclusion was necessary. *See Foster v. Wainwright*, 686 F.2d 1382, 1388 (11th Cir.1982), *cert. denied*, 459 U.S. 1213, 103 S.Ct. 1209, 75 L.Ed.2d 449 (1983).

James's remaining arguments concerning this issue are specious and warrant no further discussion.

## V. CONCLUSION

The arguments appellants present in this appeal are all meritless. We affirm their convictions in all respects.

AFFIRMED.