12 P.3d 153 (2000)
103 Wash.App. 299
STATE of Washington, Respondent,
v.
Damon Lopez CHAPPLE a/k/a Damon Greadington, Appellant.
No. 23836-5-II.
Court of Appeals of Washington, Division 2.
November 9, 2000.
*154 Manek R. Mistry, Backlund & Mistry, Chehalis, for Appellant.
Loren Oakley, Clallam Co. Deputy Pros. Atty., Port Angeles, for Respondent.

PUBLISHED IN PART OPINION
HUNT, J.
Damon L. Chapple appeals his conviction for second degree rape. He argues that the trial court erred by: (1) excluding him from trial and sentencing for disruptive behavior; (2) admitting his Mirandized[1] statements to police; (3) admitting prior recorded testimony of the physician who examined the victim; (4) precluding his cross-examination of an adverse witness; and (5) sentencing him to life in prison without the possibility of parole. In his pro se supplemental brief, Chapple also argues that he is innocent and that being shackled "in front of the jury" prejudiced his defense.
We hold that the trial court did not abuse its discretion in balancing Chapple's constitutional right to a fair trial against the court's need to manage the courtroom and to finish the trial in a safe and orderly manner. Achieving this balance was especially challenging in light of Chapple's extraordinary strength, repeated volatile disruptions, *155 threats to kill, and taunts that he was in control because he was already facing a 125-year sentence and there was nothing the court could do to deter his behavior. We affirm.

FACTS

I. THE CRIME AND INVESTIGATION
Chapple was incarcerated at Clallam Bay Corrections Center (CBCC), serving a sentence for 125 years. His cell was adjacent to Brian Moore's. On May 13, 1997, corrections officers discovered Chapple and Moore together in Chapple's cell, with Moore "[s]itting in the corner with his legs drawn underneath him." Because it is a major infraction of prison rules for two inmates to be in one cell, the officers treated Chapple's cell as a crime scene.
Officers took Chapple to the intensive management unit and Moore to the medical unit. Moore first told staff that nothing had happened. But several hours later, at 5:45 P.M., he reported that at about 1:15 P.M., Chapple had raped him. Moore consented to a "rape kit process" and was taken to Forks Hospital, where he was examined by Dr. Harvey Fritz. Dr. Fritz found bruising and "fresh" tears in Moore's rectum.
After speaking with Moore and Dr. Fritz at the hospital, Clallam County Deputy Sheriff Ralph Edington obtained a search warrant "to collect evidence and have Mr. Chapple examined." At 1:28 A.M., on May 14, Edington went to CBCC, notified Chapple of the search warrant, and gave Chapple Miranda warnings. Chapple invoked his right to an attorney and his right to remain silent; Edington left the prison.
Later that day, officers transported Chapple to the hospital "for collection of a sexual assault kit," arriving by 2:00 P.M. Chapple was restrained with "[b]elly chains, leg irons or leg cuffs and handcuffed to the belly chains." Present with Chapple were Dr. Fritz, Deputy Sheriff William Cortani, Detective Randy Pieper, possibly two other police officers, and "some corrections officers." Chapple "started [a] conversation" with Detective Pieper, telling him that "he [Chapple] would make a statement after he spoke with his attorney."
Dr. Fritz began "gathering the evidence from the rape kit," but when it came time for the rectal examination, Chapple became "very upset" and "uncooperative," threatening to bite off Pieper's nose. For nearly one-half hour, the officers "continued discussing [with Chapple] the need to adhere to the search warrant and continue the sexual assault kit collection procedures." Chapple responded "that he did not see the need for it because there was no rape, that it was with consent and there was no force used." Chapple continued that "it was consensual sex and the only reason that Moore ... was saying it was rape [was] because Mr. Moore had been caught in Mr. Chapple's cell."
Detective Pieper interrupted Chapple, asking Chapple if he "was initiating contact ... and wanted to talk about what had occurred." Chapple answered that "he did," Pieper told him he "would need to re-advise him of his rights," and Chapple said "that was fine." At that point, Sergeant Lanahan entered the room and told Chapple that he needed to comply with the search warrant; Chapple responded that "the rectal exam part was not going to be done." Pieper advised Chapple of his Miranda rights, Chapple executed a waiver of those rights, and Chapple "began explaining how ... Moore ... always came in, ... and that the sex was consensual."

II. THE DEADLOCKED FIRST TRIAL
The State charged Chapple with one count of second degree rape. At the CrR 3.5 hearing,[2] the trial court found that Chapple's statements were voluntary. When Chapple's attorney began discussing motions in limine, Chapple interjected:
[CHAPPLE]: I don't want to exclude anything. I want everything I have been accused of; don't matter; let me change my plea because I don't care....
*156 . . . .
THE COURT: In light of what you said, talk to [defense counsel] some more.
[CHAPPLE]: Look, just give me some papers.
THE COURT: I am not trying to take anything from you.
[CHAPPLE]: You can't embarrass me, take anything from me.... Get these motherfu[* *]ing papers and they can do what they have to deal with before I kill one of them.
. . . .
THE COURT: Talk to [defense counsel].
[CHAPPLE]: I don't have to talk to anybody about it.
THE COURT: Listen to me; you are creating a problem.
[CHAPPLE]: I just told you to get me some papers to sign; I don't have to talk to nobody, if I don't want to talk to them. I don't fear nothing, nobody at no time. Fu[* *] you and fu[* *] him and fu[* *] everybody else and
THE COURT: We are done.
[CHAPPLE]: I'm not fu[* *]ing around, motherfu[* *]er.... I call the shots here and when we're done, we're done.
The trial judge had Chapple removed from the courtroom and then addressed defense counsel and the prosecutor: "If he doesn't want to be here and he creates a ruckus, we will have to deal with that." Trial began in January 1998, but the jury was unable to reach a unanimous verdict.

III. THE DISRUPTED SECOND TRIAL
At Chapple's second trial, Moore testified that at the time of the rape he was 19-years-old, five-foot-nine-inches tall, and weighed 125 pounds; whereas 37-year-old Chapple was five-foot-eleven-inches tall, weighed 200 pounds, and could bench press 500 pounds and squat lift 800 pounds. Chapple had told Moore that: (1) he [Chapple] was in prison for beating two people to death;[3] (2) (one week before the rape) "he [Chapple] had 125 years; he could come over to my cell, do anything he wanted to me and there is nothing anybody could do to him"; and (3) (the day of the rape)
Either you come over to my cell or I'm coming over to yours, and I have 125 years; there's nothing anybody can do to me. I could kill you. I could beat you and I could do what I want to you. There's no amount of time somebody could give me.
Because he was afraid, Moore went to Chapple's cell, where Chapple raped him anally. Upon being discovered by corrections officers, Chapple told Moore to tell the officers that he (Moore) had come over to Chapple's cell voluntarily to watch television. When on redirect examination Moore responded to a question about Chapple's eye color, Chapple spoke out, "They are black like my skin." The trial judge instructed the prosecutor to proceed.
During Correctional Supervisor Michael Leahy's testimony, the prosecutor sought to admit a letter from Chapple to his cousin, who was incarcerated in another institution. The judge excused the jury, and the prosecutor explained to the court that Chapple had asked his cousin to threaten witnesses, including Moore. Chapple again spoke out: "They don't have any business messing with my property and there is nothing in there, no threatening mother fu[* *]ing punk...." Chapple and the trial judge had the following verbal exchange:
THE COURT: We're not talking about that issue right now.
[CHAPPLE]: I'm arguing it.
THE COURT: Let's wait and argue it.
[CHAPPLE]: This is my courtroom; isn't got nothing to do with you; this is my courtroom. None of you can do this to me up in here and this is me and my life; nothing to do with you, you little punk.
After the jury returned to the courtroom, Leahy concluded his testimony without *157 further interruption from Chapple. But when the judge excused the jury for the day, Chapple announced, "I'm going to cuss somebody out." Officers then removed him from the courtroom.
The next day, in the jury's absence, defense counsel moved to cross-examine State's witness Larry Kleven, an inmate at CBCC, about his 1996 escape attempt. The trial court initially granted the motion but ultimately denied it because Kleven said he intended to invoke his Fifth Amendment privilege against self-incrimination. With the jury present and Kleven about to take the witness stand, Chapple blurted out, "Sure be glad when you get this Klu [sic] Klux Klan meeting over with; I'm getting tired."
The trial judge again ordered the jury removed and the following colloquy ensued:
[CHAPPLE]: Sh[* *]; for what? Let the motherfu[* *]ers stay anyway.
THE COURT: Mr. Chapple, we're not going to have the trial
[CHAPPLE]: Fu[* *] the jury; fu[* *] the trial; fu[* *] all you motherfu[* *]ers. I don't give a fu[* *] about you or this trial or this jury.
THE COURT: If you don't want to participate in the trial, we'll go without you; that's the only choice you have.
[CHAPPLE]: Why did you bring me?
THE COURT: We didn't know you were going to say this.
[CHAPPLE]: You should already know.
THE COURT: You have been here and you have been participating fine up to this point and I hope you would continue to do that and we can get through the trial but if you make statements in front of the jury like that
. . . .
[CHAPPLE]: Am I lying? ...
THE COURT: I am not saying anything about that but disruption in front of the jury cannot take place. Can we try it again?
[CHAPPLE]: Continue.
Kleven testified that in August 1997, he was incarcerated in CBCC in the cell above Chapple's. Chapple had asked Kleven to tell Chapple's defense attorney that Moore told Kleven he had fabricated the rape charge against Chapple. Kleven initially refused to tell this lie, but he eventually complied when Chapple threatened repeatedly to beat him (Kleven) and rape him. After lying to Chapple's defense attorney, however, Kleven notified CBCC officers.
At this point, Chapple disrupted Kleven's testimony as follows:
[CHAPPLE]: He didn't testify for me in the trial, did you, and I got a hung jury so why would I have asked you to do anything for me. You didn't testify in the last trial, did you; sh[* *]. I let them know. Take me back to Clallam Bay if you want to. I wouldn't give a fu[* *].
THE COURT: Let's take a recess.
[CHAPPLE]: Let's take a recess on me. He didn't testify on the last trial when I got a hung jury 8 to 4 in my favor, so why would it make a difference for you to testify against me, motherfu[* *]ing
(The jury left the courtroom.)
THE COURT: We'll take him downstairs.
[CHAPPLE]: I'm the motherfu[* *]ing man. I have 125 years; I don't give a fu[* *]. Nothing you can do to me. I own the system.
(The defendant left the courtroom.)
The trial judge, the prosecutor, and defense counsel discussed available options for proceeding with the trial, including (1) shackling and gagging Chapple in the courtroom; (2) confining Chapple to the adjacent holding cell to watch the remainder of the trial on a television monitor; or (3) excluding Chapple entirely from the trial process. Defense counsel moved for a mistrial, which the court denied.
The court then heard testimony from two corrections officers concerning the available options. Correctional Investigator James Reno testified about Chapple's numerous violent crimes and prison infractions,[4] concluding *158 that Chapple posed "a very grave threat to anyone in the general vicinity." Reno described Chapple's "olympic caliber" physical strength: Even with four security officers present and Chapple wearing a stun belt, there was a real possibility that Chapple could still hurt someone; Chapple could break the handcuffs; Chapple could not be gagged; and Chapple could even kill someone. Reno had also heard that Chapple said "he would do something to disrupt the trial" if it was going "bad." Corrections Sergeant Ron Lind testified that, as he escorted Chapple from the courtroom minutes earlier, Chapple said he was "through being cooperative and he would be disruptive."
The trial court told counsel that the courtroom was not equipped to secure Chapple safely and that Chapple could still disrupt the trial if he were kept in the adjacent holding cell.[5] Concluding that "there [was] a real danger ... and possibility of somebody being harmed," the court ordered that Chapple be excluded from the courtroom for the remainder of the trial.
Nevertheless, the court gave Chapple one more chance and instructed defense counsel to speak with Chapple to see whether he had calmed down and could behave appropriately in the courtroom. Defense counsel returned, reported that he had "met with Mr. Chapple and ... discussed ... appearing in court for the balance of the trial including him testifying again" and explained that
nothing occurred which would suggest things would be any different than they have been.... As far as testifying, his intent would be to testify although it is clear that that would be done according to his rules.
The court then excluded Chapple from the courtroom during the remainder of the trial. But the court gave defense counsel the option of reading to the jury Chapple's testimony from the first trial.
Upon the jury's return, the trial court instructed them:
Mr. Chapple has chosen to no longer attend these trial proceedings. He has the right to be absent and the fact of his absence should not be used by you to infer guilt or to prejudice him in any way.
Kleven retook the witness stand. He testified that when he initially told Chapple he would not participate in Chapple's lie, Chapple became enraged, saying he would "beat [Kleven] viciously" and rape him "repeatedly... as he did Mr. Moore."
The State told the court that Dr. Fritz was unavailable to testify in person and that it wished to read into the record his testimony from the first trial. Dr. Fritz's testimony was limited to his observations of injury to Moore's rectum. Although defense counsel had earlier told the court that he would have no new questions to ask Dr. Fritz if he testified, he objected to the use of his prior recorded testimony. The court admitted the transcript under ER 804(b)(1).
Chapple's counsel called CBCC inmate Donald Snook to the witness stand. Snook testified that on June 20, 1997, while in the dayroom, Moore had told him that the rape accusation was not true. The State established on rebuttal that Moore had not been to the dayroom on June 20; rather, Moore had been there on June 19.
The jury found Chapple guilty of second degree rape. Chapple heard the verdict by telephone, said, "It won't make any difference to me," and told the trial judge, "Fu[* *] you."

IV. SENTENCING
Chapple was initially present at his sentencing hearing. He addressed the court:
[CHAPPLE]: Give me my motherfu[* *]ing time and let me get my time. Mother functioning [sic?]let me come into trial; why do itfu[* *]; why'd you call me *159 all the way over here. Give me my motherfu[* *]ing time, bitch, and let me get on with my motherfu[* *]ingdo it now or send me back like you did from the trial, punk.
THE COURT: Would you like to leave now?
[CHAPPLE]: Make me no difference. I will be appealing this, you motherfu[* *]ing Klu [sic] Klux Klan, motherfu[* *]ingI want to be here about as much as your mother wants to be there. I got no respect for you motherfu[* *]ers. You think I want to sit up here andlet your mama have a good day.
(Pause in proceedings.)
[CHAPPLE]: You think it's funny, too. All you motherfu[* *]ers think it's funny.
(The defendant was escorted out of the courtroom.)
In light of Chapple's comments and his "ability for violence," the trial court completed the sentencing in Chapple's absence and imposed life imprisonment without the possibility of parole under the Persistent Offender Accountability Act (POAA).

ANALYSIS

I. CHAPPLE'S EXCLUSION FROM THE COURTROOM

A. TRIAL
Chapple argues that his exclusion from the courtroom during the remainder of his trial was a violation of his due process and confrontation rights. But
a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.
Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). This standard was certainly met here.
Chapple's disruptive behavior began at the CrR 3.5 hearing and continued each day of his trial until the court removed him. Chapple's outburst on the second day of trial testimony likened the proceedings to a "Klu [sic] Klux Klan meeting." The court warned Chapple, "If you don't want to participate in the trial, we'll go without you; that's the only choice you have." Chapple's next outburst occurred soon thereafter, when in the jury's presence he extolled about the "hung jury" in his first trial. As he had warned, the trial court had Chapple removed from the courtroom.
The trial court heard testimony about Chapple's proclivity for dangerousness and violence, considered options that would have allowed Chapple some participation in the trial, instructed defense counsel to ask Chapple if he could behave at trial, and ultimately concluded that exclusion was the only real option that would maintain order in the courtroom. "There is no ... constitutional requirement that a court try its luck with other sanctions before excluding a disruptive defendant...." United States v. Beasley, 72 F.3d 1518, 1530 (11th Cir.1996). "[N]o formalistic sequence of warnings is required. Nor is it necessary for more than one warning to be given...." Scurr v. Moore, 647 F.2d 854, 858 (8th Cir.1981) (quotation and citation omitted).
Chapple also argues that being excluded from the courtroom usurped his right to testify in his own defense. But just as a defendant can waive his right to be present in the courtroom by "`contumacious conduct,'" so can he waive his right to testify. United States v. Nunez, 877 F.2d 1475, 1478 (10th Cir.1989) (quoting United States v. Ives, 504 F.2d 935, 941 (9th Cir.1974), vacated on other grounds, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), opinion reinstated in part, 547 F.2d 1100 (1976)); accord Chavez v. Pulley, 623 F.Supp. 672, 680-81 (E.D.Cal.1985). Here, by virtue of his willful misbehavior in the face of the court's clear warning, Chapple waived his right to be present in the courtroom, including his right to testify. Nonetheless, the trial court gave defense counsel the opportunity to read Chapple's testimony from the first trial.[6]

*160 B. SENTENCING
Chapple similarly contends that his exclusion from his sentencing proceeding violated his right to allocution. But the rule permitting exclusion in Illinois v. Allen, 397 U.S. at 343, 90 S.Ct. 1057, is equally applicable when a defendant disrupts sentencing proceedings and refuses to behave appropriately. See Collins v. State, 69 Md.App. 173, 516 A.2d 1015, 1026 (1986).
In spite of his exclusion from the remainder of his trial, the trial court gave Chapple another chance and brought him back to court to appear in person for sentencing. But Chapple immediately began verbally assaulting the court, proclaimed that he did not want to be there, and asked why the court even bothered to transport him back for sentencing. The court again considered Chapple's "ability for violence" and again excluded him from the courtroom.
Removal of a defendant for disruptive behavior is within the trial court's discretion. State v. DeWeese, 117 Wash.2d 369, 381, 816 P.2d 1 (1991). The trial court extended Chapple every opportunity to conform his behavior or risk exclusion from the courtroom. Herculean Chapple flatly refused, profanely proclaiming that it was his courtroom, he was in control, and there was nothing they could do to him. Under these circumstances the trial court appropriately exercised its discretion in excluding Chapple from the courtroom for the remainder of his trial and again for sentencing.
Affirmed.
A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
ARMSTRONG, C.J., and SEINFELD, J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Under CrR 3.5(a): "When a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing, if not previously held, for the purpose of determining whether the statement is admissible."
[3] In 1984, Chapple bludgeoned to death a drug dealer; and in 1988, he beat and stabbed to death a 58-year-old female motel manager. Within weeks of murdering the motel manager, Chapple robbed and raped a woman. The sentences imposed for these crimes totaled 125 years.
[4] Chapple's infractions from 1991 through 1997 included: "[t]hreatening either staff or inmate" (five infractions); "refusing a search"; "staff interference" (two infractions); two "dangerous infraction[s]"; "possessing a weapon"; "gambling"; "refus[ing] to go to work"; "[a]ssault, non-hospitalization"; and "strong arming another inmate."
[5] The trial judge explained:

[T]he holding room is not soundproof. My experience has been if an inmate wants to yell and scream and cause a disruption, he can do that plus I wouldn't trust the tv set anywhere hear [sic] [Chapple]. I think we would lose county property.
[6] Counsel, for reasons not apparent from the record, did not offer Chapple's prior testimony.