**Yahweh Ben YAHWEH, Plaintiff,**

v.

**UNITED STATES PAROLE COMMISSION,**
**Defendant.**

**No. 01–2848–CIV–MOORE.**

United States District Court,
S.D. Florida,
Miami Division.

Aug. 15, 2001.

Jon Allen May, May & Cohen, Fort Lauderdale, FL, for Plaintiff.

J. Kirk Ogrosky, Assistant United States Attorney, United States Attorneys Office, Miami, FL, for Defendant.

### ORDER

MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiff Yahweh Ben Yahweh's Motion for Preliminary Injunction, filed June 29, 2001; Plaintiff's Motion for Preliminary Injunction by Default, filed July 25, 2001; and Defendant United States Parole Commission's Motion to Dismiss for Lack of Jurisdiction, filed July 30, 2001. A hearing was held on said Motions on August 3, 2001, and argument from counsel for both parties was heard.

UPON CONSIDERATION of the Motions, the parties' responses and replies, and the evidence and arguments presented at the August 3, 2001 hearing, the Court enters the following Order denying Defendant's Motion to Dismiss, and denying Plaintiff's Motions for Preliminary Injunction and for Preliminary Injunction by Default.

### A. ISSUES PRESENTED

Yahweh Ben Yahweh brought this action challenging his parole conditions and seeking declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and the Religious Freedoms Restoration Act ("RFRA"), 42 U.S.C. § 2000bb–1. This action poses three fundamental issues. The first issue is whether habeas corpus is the exclusive remedy by which parolees may challenge the conditions imposed on their release. If so, this Court lacks subject matter jurisdiction over this action, and it should be dismissed without further consideration.

The second issue is whether a parolee must exhaust his administrative remedies before seeking declaratory and injunctive relief from the conditions of his parole. If so, this Court lacks subject matter jurisdiction because Yahweh Ben Yahweh had the right to appeal the decision of the Parole Commission, had notice of his right of appeal, and failed to appeal.

The third issue is, if this Court has subject matter jurisdiction over this action, whether Yahweh Ben Yahweh has shown that the parole conditions are invalid and that he is entitled to a preliminary injunction preventing their enforcement.

The Court finds that all three of these questions should be answered in the negative. Analogous Supreme Court and Eleventh Circuit precedent dictates that this Court find that habeas corpus is not the exclusive remedy of parolees challenging the conditions of their release. In addition, no law requires Yahweh Ben Yahweh to exhaust his administrative remedies before pursuing this action. Accordingly, this Court has subject matter jurisdiction over this action. However, Yahweh Ben Yahweh has failed to show that he is enti-

tled to a preliminary injunction, because he has not shown that the conditions are invalid, and therefore, he is not likely to succeed on the merits of his Complaint.

## B. THE DISPUTED PAROLE CONDITIONS

In this action, Yahweh Ben Yahweh challenges the imposition of the following parole conditions upon his mandatory release, which will occur on August 17, 2001:

> You shall not associate or have any contact with members of the Black Hebrew group.[1] This includes direct or indirect contact through any means, to include internet, television, radio, phone, written form or in person. This includes residence, employment, social or other activities, without the prior written approval of your U.S. Probation Officer
> ....

> In addition, you shall be precluded from employment provided by members of the Black Hebrews or the group itself or associated in any manner with group members without prior written approval of the U.S. Probation Officer.

> Further, you shall be prohibited from use of the internet as a means of communication with members of the Black Hebrews. You shall not possess a computer with internet access either personally or as part of any employment unless approved in writing by your U.S. Probation Officer.[2]

## C. BACKGROUND FACTS

Yahweh Ben Yahweh moved to Miami in 1979, and began spreading his message that "blacks are the true Jews, that God and Jesus are black, and that he has been chosen by 'the Terrible Black God, Yahweh' to lead blacks from years of oppression to the promised land of Israel."[3] His following grew, and by late 1980, the Nation of Yahweh bought a Miami building known as the "Temple of Love."[4] Many businesses were established inside the Temple, and followers lived inside the Temple and gave all their possessions to the Temple.[5]

Beyond these basic facts, the history of Yahweh Ben Yahweh and the religion of the Nation of Yahweh is a history of dichotomy. On one hand, the Nation of Yahweh has been recognized as a legitimate religion, and the Eleventh Circuit has stated that the religion "had adherents who never became involved in illegal activity and who were not implicated in this conspiracy."[6] Indeed, at the August 3 hearing, counsel for Yahweh Ben Yahweh introduced a number of followers of the Nation of Yahweh, which he represented to include, among others, a doctor, a lawyer, a business executive, an electrician, a registered nurse, a legal assistant, a lab technician, and a beauty salon owner and operator. Yahweh Ben Yahweh's counsel observed that these people, and others like them in the community, "who preached and who represented values of self-worth and self-reliance and independence made a

---

1. Yahweh Ben Yahweh has indicated that this description of his religious group is inaccurate and offensive. The Parole Commission has expressed a willingness to change this label. Therefore, this Order refers to the religion as the Nation of Yahweh, which is the term used by counsel for Yahweh Ben Yahweh.

2. Complaint, Exhibit A.

3. *United States v. Beasley,* 72 F.3d 1518, 1521 (11th Cir.1996), *cert. denied, Ben Yahweh v. United States,* 519 U.S. 866, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996).

4. *Id.*

5. *Id.*

6. *Id.* at 1526 n. 7.

contribution to the community that for a period of time . . . was recognized" as having "a significant positive impact on the community."[7]

The undersigned also heard the testimony of Wendellyn Rush, who is an attorney and has represented Yahweh Ben Yahweh in his parole proceedings.[8] She characterized herself as an adherent to the Nation of Yahweh, and described the basic tenets of the religion.[9] She testified that she believes that "there is one God, Yahweh, who is the father of all men; that the Bible in Yahweh Ben Yahweh is the great light and the guide and the rule of faith and practice," and "that destiny is determined by character, integrity and morality."[10] She further testified that followers of the Nation of Yahweh religion "are taught to be benevolent. We are taught to practice and protect chastity and asked to practice principles of morality."[11]

On the other hand, apparently at odds with these tenets, the history of Yahweh Ben Yahweh and the Nation of Yahweh is besmeared by acts of violence. The criminal trial of Yahweh Ben Yahweh and his co-defendants was characterized by then Chief Judge Roettger as "arguably the most violent case ever tried in federal court: the indictment charges the sixteen defendants on trial with 14 murders by means such as beheading, stabbing, occasionally by pistol shots, plus severing of body parts such as ears to prove the worthiness of the killer."[12] Ultimately, Yahweh Ben Yahweh was convicted of violat-

ing 18 U.S.C. § 1962(d), which makes it unlawful for any person to conspire to violate RICO.[13]

In upholding this conviction, the Eleventh Circuit observed that the government proved that Yahweh Ben Yahweh agreed to the commission of two or more of eighteen predicate criminal acts of homicide, attempted homicide, and arson.[14] The Eleventh Circuit also determined that the government proved that these acts "all revolved around the simple purposes of silencing dissension, retaliating for community resistance, and making the 'death angels' a reality," and continued over approximately a five-year period.[15] It further determined that the government proved that these racketeering acts "bolstered members' morale and commitment to the group and reinforced members' hostility to the outside community."[16] Lastly, the Eleventh Circuit stated that the jury "properly rejected [Yahweh Ben Yahweh's] argument that the government merely showed his innocent association with the enterprise."[17] Indeed, it held that evidence of Yahweh Ben Yahweh's religious beliefs was properly admitted at the trial because "the evidence was relevant to show how Yahweh exerted influence and control over the members and how he used his preachings to justify heinous crimes."[18]

Faced with these dichotomies inextricably intertwined with the history of Yahweh Ben Yahweh and the Nation of Yahweh,

---

7.  Hearing Transcript, p. 12.

8.  *Id.* at 30.

9.  *Id.* at 39.

10.  *Id.*

11.  *Id.*

12.  *United States v. Yahweh,* 792 F.Supp. 104, 105 (S.D.Fla.1992).

13.  *See Beasley,* 72 F.3d at 1525.

14.  *Id.* at 1522–24.

15.  *Id.* at 1525–26.

16.  *Id.* at 1526.

17.  *Id.*

18.  *Id.*

this Court turns to the issues presented above.

## D. EXCLUSIVITY OF HABEAS CORPUS REMEDY

The Parole Commission has moved to dismiss on the ground that habeas corpus is the exclusive means by which Yahweh Ben Yahweh may challenge his parole conditions, and therefore, that this Court is without subject matter jurisdiction to consider a challenge to parole conditions brought pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 2000bb–1. The parties have acknowledged, and the Court agrees, that the narrow issue of whether habeas corpus is an exclusive remedy for parolees challenging the conditions of their release is a matter of first impression within the Eleventh Circuit. However, similar issues have been addressed in both the Supreme Court and the Eleventh Circuit, and to the extent that the underlying rationale in those cases can be analogized to the instant case, their reasoning will be adopted and followed by this Court.

The starting point of this analysis is the seminal case of *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In *Preiser,* state prisoners brought a Civil Rights Act suit to compel the restoration of good-conduct-time credits, which were revoked as a result of disciplinary proceedings. *Id.* Restoration of the credits would have resulted in the prisoners' immediate release on parole. *Id.* The Supreme Court held that the district court did not have jurisdiction over the action because, "when a prisoner is challenging the very *fact or duration* of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500, 93 S.Ct. 1827 (emphasis added).

However, the *Preiser* Court distinguished and upheld cases in which prisoners were permitted to bring non-habeas federal civil rights actions to challenge the *conditions* of their confinement in prison. *Preiser,* 411 U.S. at 498, 93 S.Ct. 1827. The Court distinguished these cases on the ground that "none of the prisoners was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from confinement—the heart of habeas corpus." *Id.* Accordingly, the Court concluded that the remedies sought in these cases, which did not go to the heart of habeas corpus, were not the exclusive province of habeas corpus. *Id.*

Following this *dicta* in *Preiser,* as well as subsequent Supreme Court cases, the Eleventh Circuit and the former Fifth Circuit have exercised jurisdiction over non-habeas federal civil rights actions brought by prisoners challenging the conditions of their confinement. *See Lawson v. Singletary,* 85 F.3d 502 (11th Cir.1996); *Hardwick v. Ault,* 517 F.2d 295 (5th Cir.1975). In *Lawson,* prison inmates of the Nation of Yahweh faith brought a Civil Rights Act and RFRA class action challenging the refusal of prison officials to allow their religious texts within the prison. *Lawson,* 85 F.3d at 504–05. The allegations in *Hardwick* similarly pertained to the interference of prison officials with a prisoner's receipt of newspapers, books, and writing materials. The *Hardwick* court concluded that the plaintiff was "challenging the conditions of his confinement, rather than its fact or duration," and thus, "may bring an action under 42 U.S.C. § 1983." *Hardwick,* 517 F.2d at 297.

In addition, while the Eleventh Circuit has never been faced with a non-habeas challenge to parole conditions, the Eleventh Circuit has upheld non-habeas challenges to certain other parole decisions.

For instance, in *Clark v. State of Georgia Pardons and Paroles Board,* 915 F.2d 636 (11th Cir.1990), a state prisoner brought a civil rights action alleging that he was unconstitutionally denied parole as a result of his pursuing an action for the wrongful death of his brother, and seeking prospective injunctive relief in the form of a "change in the Board's procedure for considering parole, so that he [would] receive a fair parole decision in the future." *Id.* at 638. The district court treated the action as a petition for habeas corpus, and the Eleventh Circuit reversed, holding that "if a state prisoner in a section 1983 action seeks only prospective injunctive relief or damages, he does not have to seek habeas corpus relief." *Id.* (*citing Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

The Seventh Circuit, on the other hand, has resolved the specific issue before this Court—whether a challenge to parole conditions must be brought in the form of a petition for habeas corpus. In the directly analogous case of *Drollinger v. Milligan,* 552 F.2d 1220 (7th Cir.1977), the Seventh Circuit distinguished the prison conditions cases, which need not be brought under habeas corpus, and held that a parolee challenging the conditions of her parole "must proceed by means of a petition for habeas corpus." *Id.* at 1225. The *Drollinger* court reasoned that "the nature of custody while in prison differs significantly from that experienced while on probation." *Id.* Unlike prison conditions, the court observed that "elimination or substitution . . . of one of the conditions of [the plaintiff's] probation would free her substantially from her confinement." *Id.* It conclud-

ed that this "release from custody, even if only partial, is the traditional function of the writ of habeas corpus," and therefore, that habeas corpus is the only permissible means by which such release can be achieved. *Id.* (*citing Preiser,* 411 U.S. at 490, 93 S.Ct. 1827). While *Drollinger* is persuasive authority, it is not binding on this Court.

There are sound policy considerations that support the Seventh Circuit's *Drollinger* decision. However, policy considerations aside, this Court adheres to the underlying rationales of the previously cited Supreme Court and Eleventh Circuit cases, and leaves the contrary reasoning in *Drollinger* for appellate review. The collective mandate of cases such as *Preiser, Wolff, Lawson, Hardwick,* and *Clark* is inescapable: habeas corpus is not an exclusive remedy for parolees challenging their parole conditions.[19]

Though the Parole Commission relies heavily on the Supreme Court's holding in *Preiser* that the habeas corpus remedy is exclusive when the fact or duration of custody is challenged, that rule of law is not applicable to the instant case. *See Preiser,* 411 U.S. at 500, 93 S.Ct. 1827. The *Preiser* Court expressly distinguished prison conditions cases which did not challenge the fact or duration of the custody, and upheld the rule that such cases need not be brought under habeas corpus. *Id.* The Parole Commission's reliance on *Preiser* is either a misreading of the holding, or an attempt to extend the holding beyond the narrow issue presented. Regardless, this Court finds that parole conditions cases are indistinguishable from prison condi-

---

**19.** This reliance on cases addressing 42 U.S.C. § 1983 actions is not misplaced, even though the instant case challenges the constitutionality of *federal* action, and is therefore not a 42 U.S.C. § 1983 action. While some of the same considerations are not present in challenges to federal action, such as issues of federalism and comity, courts usually apply § 1983 law to suits challenging the constitutionality of the actions of federal officials. *See Abella v. Rubino,* 63 F.3d 1063, 1065 (11th Cir.1995). Consequently, this Court has relied on § 1983 case law to determine this issue.

tions cases for the purposes of determining which causes of action are available to each.

A brief comparison of prison conditions and parole conditions reveals their intrinsic similarity. Once convicted and confined in prison, a prisoner is usually subject to certain rules and regulations. For example, he often must wear what he is told to wear, cut his hair the length he is directed to cut it, or read only what he is permitted to read. A challenge to these rules and regulations is a challenge to the conditions of this prison life, and, irrefutably, need not be brought as a habeas corpus petition. *See generally Preiser,* 411 U.S. at 498, 93 S.Ct. 1827; *Lawson,* 85 F.3d at 504–05; *Hardwick,* 517 F.2d at 297.

Under certain circumstances, a prisoner may be released on parole before the expiration of his sentence. However, a parolee is not a free man. Though he is no longer confined within prison walls, the parolee remains a ward of the state until the expiration of his sentence; the custodian of the parolee simply becomes the parole board instead of the prison warden.[20] And, instead of the rules and regulations of prison life, he is subject to the conditions imposed on him by his new custodian, the parole board.[21] These conditions often require him to work where he is directed to work, live where he is directed to live, or associate only with whom he is permitted to associate. A challenge to these rules and regulations is a challenge to the conditions of his parole life.

The *Drollinger* court, as discussed, distinguished the prison conditions cases by describing parole as "by its nature less confining than incarceration." *Drollinger,* 552 F.2d at 1225. It further observed that the lifting of a parole condition would free the plaintiff "substantially from her confinement," and that, "figuratively speaking, one of the 'bars' would be removed from her cell." *Id.* This description is certainly accurate, but does not tell the whole story. Fundamentally, parole is not freedom, and should not be construed as such. The Supreme Court, in describing "the function of parole in the correctional process," has observed, "[r]ather than being an ad hoc exercise of clemency, parole is an established variation on imprisonment of convicted criminals." *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). This is so regardless of the severity or leniency of the conditions imposed on the parolee. Therefore, stringent parole conditions are *not,* in essence, the figurative "bars" that confine the parolee. Rather, it is the underlying conviction and sentence that confine the parolee, that make him a ward of the state rather than a free man. The parolee's ultimate transition to freedom is defined by the expiration of his sentence, not by the removal of a parole condition.[22]

---

**20.** *See* 18 U.S.C. § 4164 (providing that when a prisoner is released on mandatory release, he is "deemed as if released on parole until the expiration of his maximum term for which he was sentenced less one hundred and eighty days"); *see also Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (finding that parolee challenging the constitutionality of his state sentence was in "custody" of the parole board for the purposes of invoking habeas corpus relief); *Clay v. Henderson,* 524 F.2d 921, 923 (5th Cir. 1975) (holding that, under mandatory release statute, a mandatorily released parolee was subject to the Parole Board's jurisdiction until the expiration of his maximum term less one hundred eighty days).

**21.** *See* 18 U.S.C. § 4164, *Jones,* 371 U.S. at 243, 83 S.Ct. 373; *Clay,* 524 F.2d at 923.

**22.** A parolee, released from prison on mandatory release, is under the jurisdiction of the parole board until the expiration of sentence less 180 days, regardless of the conditions imposed upon his release. *See* 18 U.S.C. § 4164; *see also Jones,* 371 U.S. at 243, 83 S.Ct. 373; *Clay,* 524 F.2d at 923.

Furthermore, the purposes for and the consequences of violating prison rules and parole conditions are similar. Prison rules are designed to advance the rehabilitation of the prisoner, and to protect the other prisoners, the prison guards, and ultimately, the community.[23] Analogously, two major purposes of parole conditions are the rehabilitation of the prisoner and the protection of the public.[24] In addition, violations of prison rules and parole conditions may both result in further loss of liberty by the prisoner or parolee. For instance, the violation of parole conditions may result in re-confinement in prison, or in the imposition of stricter conditions. Similarly, the violation of prison rules may result in seclusion in solitary confinement, transfer to a more secure prison, or in the imposition of stricter prison rules.[25]

Consequently, in the absence of any controlling authority on this issue, a reading of current law in this circuit would suggest that challenges to parole conditions should be treated no differently than challenges to prison conditions, at least for the purposes of determining what causes of action may be used to challenge each. Both are challenges to the prescripts of the custody, whether that custody is in prison or parole. Neither challenge attacks the underlying conviction or seeks to shorten the sentence. Ultimately, neither challenge expedites the moment of freedom when the individual may no longer be classified as a ward of the government.[26] And finally, the purposes for prison rules and for prison conditions are similar, as are the consequences of violating them.

In conclusion, this Court follows the prison conditions cases and concludes that habeas corpus is not the exclusive means by which parolees may challenge the conditions of their release. Accordingly, Yahweh Ben Yahweh's action may properly be brought outside of habeas corpus.

### E. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The Parole Commission has also asked the Court to dismiss this action for lack of subject matter jurisdiction because Yahweh Ben Yahweh has failed to exhaust his administrative remedies. Indeed, because the action was designated an "original jur-

---

**23.** For example, in *Lawson v. Singletary*, the Florida Department of Corrections asserted that it restricted the receipt of certain religious materials because it felt that the materials "presented a serious threat to security and order within Florida's prisons." 85 F.3d at 504.

**24.** *See* 18 U.S.C. § 4209(a) (authorizing such conditions as are reasonable "to protect the public welfare"). *See also Morrissey v. Brewer*, 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (noting that a purpose of parole is "to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed").

**25.** *Cf. Moreno v. State of Cal.*, 25 F.Supp.2d 1060, 1063 (N.D.Cal.1998). The *Moreno* court held that, because "violations of such [parole] conditions may result in further incarceration, it is logical that parole conditions

be considered part of the sentence." Having found that parole conditions are part of the underlying sentence, the court concluded that habeas corpus was the exclusive means by which a parolee might challenge those conditions. However, this Court does not see the risk of further incarceration posed by violation of parole conditions as a proper basis for distinguishing prison conditions cases, for violation of prison rules may have similar liberty-limiting consequences. Indeed, the Supreme Court has aptly observed that parole "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of parole conditions." *Morrissey v. Brewer*, 408 U.S. 471, 479, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**26.** *See* 18 U.S.C. § 4164; *see also Jones*, 371 U.S. at 243, 83 S.Ct. 373; *Clay*, 524 F.2d at 923.

isdiction" action, Yahweh Ben Yahweh had a right to appeal the decision of two members of the Parole Commission to the full board of five members.[27] He had notice of this right of appeal, yet failed to do so.[28] Instead, he filed the action now before the Court.

■ The narrow question of whether a parolee challenging the conditions of his release must first exhaust his federal administrative remedies has also not yet been directly addressed by the Supreme Court or by the Eleventh Circuit.[29] To determine whether failure to exhaust federal administrative remedies precludes the cause of action, courts engage in a two-step inquiry. First, courts must determine whether, under the operative statutes, Congress specifically mandated an exhaustion requirement; if so, the exhaustion requirement is not discretionary with the court. *See McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *see also Bastek v. Federal Crop Ins. Corp.,* 145 F.3d 90, 94 (2d Cir. 1998). Second, if congressional intent to require exhaustion is not clearly apparent, courts should determine whether a common law exhaustion requirement is applicable, this inquiry gives broad discretion to district courts. *See McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081; *Bastek,* 145 F.3d at 94.

Under this analysis, the first matter of inquiry is whether, in enacting 28 C.F.R. § 2.27, which provides for administrative appeal of "original jurisdiction" parole cases, Congress clearly intended to require

parolees to exhaust this right of appeal before challenging their conditions in federal court. On this issue, the Parole Commission puts great weight on the case of *Rauschenberg v. Williamson,* 785 F.2d 985 (11th Cir.1986). In *Rauschenberg,* the Eleventh Circuit declined to recognize a *Bivens* cause of action where a parolee alleged that the parole officer misled him about the parole appeals process. *Id.* at 988. The court reasoned, "[W]e do not believe that the congressional purposes in designing the detailed statutory/regulatory scheme set up under the Parole Commission and Reorganization Act of 1978 would be served by recognizing a *Bivens* cause of action" under the facts alleged. *Id.*

While this *Rauschenberg* language may be instructive in the instant case, it must be recognized that its legal background is drastically different. Unlike the plaintiff in *Rauschenberg,* Yahweh Ben Yahweh has not asked this Court to invent a new *Bivens* cause of action for him. *Rauschenberg,* 785 F.2d at 988. Rather, Yahweh Ben Yahweh relies on the *congressionally created* causes of action in the RFRA and 28 U.S.C. § 2201. This Court would have to extend *Rauschenberg* well beyond its essential holding to find that the inference of Congressional intent, drawn from "the detailed statutory/regulatory scheme" of the parole process, also precludes these expressly-established causes of action pending exhaustion of federal administrative remedies. *Id.* at 988. Under *McCarthy,* exhaustion is only mandatory and non-discretionary where "Congress specifically

**27.** *See* 28 C.F.R. § 2.27.

**28.** Complaint, Exhibit A.

**29.** Of course, courts have held that a petition for habeas corpus may only be brought after exhaustion of federal administrative remedies, and the Parole Commission has relied on these cases. *See, e.g., Perez–Perez v. Hanberry,* 781 F.2d 1477 (11th Cir.1986); *Gonzalez v.*

*Perrill,* 919 F.2d 1 (2d Cir.1990); *Merki v. Sullivan,* 853 F.2d 599, 600–01 (8th Cir. 1988). However, these cases are not informative as these courts have based their decisions on the clear exhaustion requirement of habeas corpus, which is not applicable to this case. None of these courts have concluded, based *solely* on an examination of RFRA or the applicable parole statutes, that it was Congress's intent to require exhaustion.

mandates" it. *McCarthy*, 503 U.S. at 144, 112 S.Ct. 1081. Therefore, this Court concludes that there is not currently a statutory exhaustion requirement for parolees who bring non-habeas claims challenging parole conditions.[30]

Having determined that the Parole Commission's position that exhaustion is statutorily required is not supported, the Court turns next to the issue of whether a common law exhaustion requirement is applicable. Initially, it is important to recognize that requiring exhaustion has many benefits. *See McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Exhaustion avoids "premature interruption of the administrative process" and allows the exercise of proper "executive and administrative autonomy." *Id.* at 193–94, 89 S.Ct. 1657. In addition, "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *Id.* at 195, 89 S.Ct. 1657. Finally, requiring an individual to pursue his administrative remedies, may, if he is successful, obviate the need for court interference. *Id.* at 194–95, 89 S.Ct. 1657.

■ However, in spite of these benefits to exhaustion, the common law exhaustion requirement is permeated with exceptions. These exceptions are clearly stated in *McCarthy v. Madigan*, in which the Supreme Court held that a prisoner who brought a *Bivens* claim and was seeking only monetary damages was not required to exhaust administrative remedies provided by the Bureau of Prisons grievance procedures. *McCarthy*, 503 U.S. at 149, 112 S.Ct. 1081.[31] First, the Supreme Court held that exhaustion should not be required where it may "occasion undue prejudice to subsequent assertion of a court action." *Id.* at 147, 112 S.Ct. 1081. Second, the Court held that exhaustion is not required where an administrative remedy would be inadequate. For example, the administrative remedy may be inadequate when an agency "lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute," or "where the challenge is to the adequacy of the agency procedure itself." *Id.* at 147–48, 112 S.Ct. 1081. Third and finally, the Court held that "an administrative remedy may be inadequate where the administrative body has been shown to be biased or has otherwise predetermined the issue before it." *Id.* at 148, 112 S.Ct. 1081.

■ Yahweh Ben Yahweh's action falls into the second category and, to a lesser extent, into the third category of exceptions listed in *McCarthy*, and therefore, the common law exhaustion requirement does not necessarily apply. *McCarthy*, 503 U.S. at 147–49, 112 S.Ct. 1081. One aspect of Yahweh Ben Yahweh's challenge

---

**30.** Notably, there is reason to believe that if Congress were to visit the issue today, it might well, and for good reason, impose an exhaustion requirement on parolees. This belief is based on the recent passage of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(a), which requires prisoners to exhaust their administrative remedies before challenging the conditions of their prison facility in federal court. However, this statute is expressly limited to prisoners confined in a jail, prison, or other correctional facility. Congress has not yet expanded the PLRA to include parolees, whether by design or oversight, and it is not for this Court to speculate whether or when Congress might impose such a requirement.

**31.** The *McCarthy* case is distinguishable from the instant case in that it would be within the scope of the authority of the Parole Commission to grant the relief sought by Yahweh Ben Yahweh. *McCarthy*, 503 U.S. at 149, 112 S.Ct. 1081. However, *McCarthy* is controlling to the extent that the other listed exceptions to the exhaustion requirement may be applicable to this case. *Id.*

is his allegation that the Parole Commission improperly relied exclusively on his conviction in determining that he poses a risk to the community. This allegation may be characterized as a challenge to the "procedures" employed by the Parole Commission in setting his special parole conditions, and therefore, is exempted from the exhaustion requirement. *See id.* at 147–48, 112 S.Ct. 1081. In addition, it is fair to conclude that the administrative appeal presented little hope for Yahweh Ben Yahweh that the Parole Commission would, under these established procedures, reverse its underlying determination that Yahweh Ben Yahweh poses an extreme risk to the community.[32] Rather, all parties recognized that the fundamental issue on appeal inevitably would have been the validity of the parole conditions in light of the RFRA and the First Amendment.[33] While the Parole Commission has great expertise in determining an individual's risk level, and in setting appropriate re-

straints on his release, its institutional competence may be less suited to the evaluation of these highly complex constitutional and statutory arguments. *See id.*[34]

■ Finally, it is important to note that the Supreme Court has committed the decision of whether to require common law exhaustion in a given case to the "sound discretion of the district courts." *NLRB v. Industrial Union of Marine & Shipbuilding Workers of Am.*, 391 U.S. 418, 426, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). Similarly, the Eleventh Circuit has observed that common law "exhaustion is not a jurisdictional doctrine, but one subject to the discretion of the trial court." *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1556 (11th Cir.1985); *see also Jean v. Nelson*, 711 F.2d 1455, 1505 (11th Cir. 1983) ("[A]lthough as a general matter judicial economy and deference to administrative tribunals require a plaintiff to pursue all administrative remedies prior to requesting relief in court, circumstances

---

**32.** This is not to say that the Parole Commission was biased. Indeed, to the contrary, the Court finds no support in the record for Yahweh Ben Yahweh's conclusory allegations that the Parole Commission was hostile and biased against him. However, based on its review of Yahweh Ben Yahweh's conviction, the Parole Commission has, over the course of Yahweh Ben Yahweh's incarceration, repeatedly found that Yahweh Ben Yahweh poses a risk to the community, as is discussed in more detail in the following section. Therefore, while this conclusion is certainly not unfair or biased, it can safely be characterized as highly likely to be upheld, or "predetermined." *Id.* at 148, 112 S.Ct. 1081.

**33.** At the May 2, 2001 parole hearing, Yahweh Ben Yahweh protested when the parole examiner explained the conditions that would likely be imposed on his release, saying, "that's denying me the right to practice my faith." Hearing, Exhibit G, page 6. The parole examiner responded, "Well, I'm just telling you that's likely what's going to happen to you. You know, that's going to be your argument." *Id.* This dialogue suggests that both parties knew that the central issue was and

would be the validity of the conditions under RFRA and the First Amendment.

**34.** In *Irwin v. Hawk*, 40 F.3d 347 (11th Cir. 1994), the Eleventh Circuit required a prisoner who brought a *Bivens* claim to exhaust certain Bureau of Prison remedies, even though denial of his claim may have been likely. *Id.* at 349. The court relied in part on a Seventh Circuit case finding that exhaustion should be required even when relief is unlikely, because a statement of the reasons for the denial could be helpful to the district court in considering the merits of the claim. *Id.* (*quoting Greene v. Meese*, 875 F.2d 639, 641 (7th Cir.1989)). Unlike the *Irwin* and *Greene* cases, the Parole Commission has already given its detailed reasons for previously denying Yahweh Ben Yahweh's requests for release and now for imposing special conditions on his mandatory release. Therefore, further development of the record on appeal would not assist with this Court's evaluation of the constitutional and RFRA issues implicated by the Parole Commission's actions.

may mitigate against exhaustion in a given case."). On the specific facts of this case, a waiver of the common law exhaustion requirement and an exercise of jurisdiction is eminently appropriate in light of the quickly approaching mandatory release date and the likelihood of appellate review, which would be aided by a complete determination by this Court of the issues presented.

Having concluded that Yahweh Ben Yahweh was not required to seek relief through habeas corpus, and that he was not required to exhaust his administrative remedies, this Court denies the Parole Commission's motion to dismiss for lack of subject matter jurisdiction. Accordingly, this Court exercises jurisdiction over this action, and proceeds to consider the merits of Yahweh Ben Yahweh's motion for preliminary injunction.

## F. PRELIMINARY INJUNCTION

### I. Requisite Elements of Preliminary Injunction

█ In order to obtain a preliminary injunction enjoining the Parole Commission from enforcing the parole conditions, Yahweh Ben Yahweh must show that (1) there is a substantial likelihood that he will ultimately prevail on the merits; (2) there is a substantial threat of irreparable harm to him if the injunction is not issued; (3) the threatened harm to him outweighs the threatened harm to the Parole Commission from issuance of the injunction; and (4) the granting of a preliminary injunction will serve the public interest. *See Panama City Med. Diagnostic, Ltd. v.*

Williams, 13 F.3d 1541, 1545 (11th Cir. 1994). This Court concludes, upon examining the disputed parole conditions in light of the applicable legal standards, that Yahweh Ben Yahweh has not shown a substantial likelihood that he will ultimately prevail on the merits. Accordingly, consideration of the remaining factors is not necessary.

### II. Applicable legal standards

█ Yahweh Ben Yahweh alleges that his parole conditions violate his rights under both the First Amendment and the Religious Freedoms Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. In order to show that his parole conditions violate his First Amendment freedoms of religion, speech, or association, Yahweh Ben Yahweh must show that the parole conditions are not "reasonably related" to his rehabilitation or to the protection of the public. *See, e.g., United States v. Smith,* 618 F.2d 280, 282 (5th Cir.1980) (applying the "reasonably related" test to First Amendment challenge to parole conditions).[35] The *Smith* court held that the existence of this reasonable relation "must be ascertained in light of (1) the purpose sought to be served by the probation; (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be accorded to probationers; and (3) the legitimate needs of law enforcement." *Id.* (citation omitted).

█ The RFRA standard, on the other hand, "provides statutory protection for religious practice that is broader than the core constitutional right," and therefore, demands more of the Parole Commission. *Lawson v. Singletary,* 85 F.3d 502, 511 (11th Cir.1996).[36] In order to state a

---

**35.** *See also United States v. Schave,* 186 F.3d 839, 843 (7th Cir.1999) (holding that "a court will not strike down conditions of release, even if they implicate fundamental rights, if such conditions are reasonably related to the ends of rehabilitation and protection of the public from recidivism"); *United States v. Ter-*

rigno, 838 F.2d 371, 374 (9th Cir.1988) (same).

**36.** In *City of Boerne v. Flores,* the Supreme Court held that RFRA violated Congress' § 5 enforcement powers, and was therefore unconstitutional as it applied to state action. 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d

claim under RFRA, Yahweh Ben Yahweh must first show that his parole conditions substantially burden the exercise of his sincerely held religious beliefs; if he does so, the Parole Commission must then demonstrate that (1) the parole conditions were imposed in furtherance of a compelling government interest, and (2) the parole conditions are the least restrictive means of furthering that compelling government interest. *See* 42 U.S.C. § 2000bb; *see also Gibson v. Babbitt*, 223 F.3d 1256, 1258 (11th Cir.2000); *Fawaad v. Jones*, 81 F.3d 1084, 1086–87 (11th Cir. 1996) ("RFRA now would require us to apply strict scrutiny to the prison regulation."); *Gunning v. Runyon*, 3 F.Supp.2d 1423, 1433 (S.D.Fla.1998). However, in applying this heightened test, the Court must, even under RFRA, take into consideration the unique environment in which the burden occurs. *See Lawson*, 85 F.3d at 509–11 (observing that the "Supreme Court has historically applied the compelling interest standard somewhat differently depending on the context in which the protected right arose," and therefore, tempering the RFRA compelling interest test by considering the special circumstances of the prison environment); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (holding that First Amendment guarantees must be "applied in light of the special characteristics of the ... environment").[37]

### III. Applying the RFRA strict scrutiny test

#### a. Substantial burden on the exercise of a religious belief

■ Yahweh Ben Yahweh has shown that the parole conditions substantially burden his exercise of religion. The Eleventh Circuit has already recognized that the Nation of Yahweh constitutes a religion for the purpose of this analysis. *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir.1996), *cert. denied, Ben Yahweh v. United States*, 519 U.S. 866, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996). In addition, the parole conditions certainly have burdened the exercise of that religion by prohibiting Yahweh Ben Yahweh from associating with his followers without advance permission. The government argues that this burden is not substantial because Yahweh Ben Yahweh may still practice his religion on his own; specifically, he may pray, believe, study, read, research, or perform ceremonies without associating with other followers. However, Yahweh Ben Yahweh counters that his exercise of religion is substantially burdened because he can no longer perform these religious activities with other

624 (1997). However, the Eleventh Circuit has continued to apply the heightened RFRA standard to federal action. *See Gibson v. Babbitt*, 223 F.3d 1256, 1258 (11th Cir.2000). Therefore, the RFRA is applicable to the case at bar, which challenges only federal action. Furthermore, pre-*Flores* cases applying the heightened RFRA standard to state action are still relevant and controlling to the extent that they may be extrapolated to RFRA challenges to federal action.

**37.** In *Lawson*, the Eleventh Circuit observed that, by "referring to the 'compelling interest test,' Congress obviously intended for courts to look for guidance to those cases employing that term." *Lawson*, 85 F.3d at 508. However, to date, no published opinion has analyzed First Amendment or RFRA challenges to parole conditions under the "compelling interest test." Therefore, RFRA could, conceivably, be interpreted to require only that parole conditions "reasonably relate" to the purposes of parole, as this is the most demanding test that has been applied to parole conditions that encroach upon First Amendment freedoms. *See, e.g., Smith*, 618 F.2d at 282. Nevertheless, because the law is unsettled, the Court has applied the strict scrutiny test as it is set forth in RFRA and leaves for appellate consideration a further pronouncement on the precise contours of this test.

believers.[38] The Court must agree. A restriction that prohibits an individual from engaging in group worship, but allows solitary worship, must be characterized as a substantial burden when group worship has been shown to be an important aspect of the religion.

Because Yahweh Ben Yahweh has shown that his burden is substantial, the government must demonstrate, under RFRA, that it seeks to advance a compelling interest, and that the parole conditions are the least restrictive means capable of protecting that interest. These factors are then considered in light of the unique circumstances of parole. *See Lawson*, 85 F.3d at 509–11.

### b. The government's compelling interest

The Court is satisfied that the Parole Commission has shown that, in arriving at Yahweh Ben Yahweh's parole conditions, it sought to advance a compelling government interest. At a hearing held on May 2, 2001, a parole examiner recommended that special conditions be imposed on Yahweh Ben Yahweh's mandatory release, because Yahweh Ben Yahweh "poses an extreme risk to the community." [39] The protection of the public from a parolee who "poses an extreme risk to the community" is of paramount importance, and the Court has little difficulty in arriving at the conclusion that such protection constitutes a compelling government interest.

Yahweh Ben Yahweh, however, disputes the underlying determination that he poses an extreme risk to the community. He argues that the determination is inherently flawed because the Parole Commission considered no evidence other than his conviction in reaching its conclusion. However, Yahweh Ben Yahweh provides no law in support of his position that the Parole Commission is obligated to consider evidence other than the underlying conviction. Yahweh Ben Yahweh will remain under the jurisdiction of the government because of that very conviction until the year 2008.[40] The proposition that his custodian, the Parole Commission, cannot rely heavily, even exclusively, on that conviction in evaluating his risk level and in determining the appropriate scope of his freedom is unsupportable.[41]

Here the Parole Commission's determination that Yahweh Ben Yahweh poses an extreme risk to the community is clearly supported by the underlying conviction. As discussed, the Eleventh Circuit concluded that Yahweh Ben Yahweh "used the religion as a means of exhorting his followers to commit the racketeering acts" discussed above. *Beasley*, 72 F.3d at 1527. Similarly, it was noted that Yahweh Ben Yahweh "ordered his followers to commit numerous acts of murder, secure in the knowledge that his orders would be carried out." *Id.* at 1526. Finally, the court concluded that these acts "all revolved around the simple purpose of silencing dissension, retaliating for community resistance, and making the 'death angels' a reality." *Id.* at 1525–26. Relying on these Eleventh Circuit findings, the Court finds that the Parole Commission was justified

---

**38.** For example, Yahweh Ben Yahweh put on evidence that an important aspect of his religion is the observance of three high holy days each year, in which the followers gather at a specified location. Under the parole conditions, Yahweh Ben Yahweh cannot attend these events without advance permission from his parole officer.

**39.** Parole Commission Response, Exhibit H.

**40.** *See* 18 U.S.C. § 4164.

**41.** The parole statute, pursuant to which parole conditions are set, allows consideration of "the nature and circumstances of the offense" and "the history and characteristics of the parolee." 18 U.S.C. § 4209(a).

in determining that Yahweh Ben Yahweh poses an extreme risk to the community.

To the extent that counsel for Yahweh Ben Yahweh alleged in oral argument that bias or hostility tainted the Parole Commission's decision, the Court finds that these allegations are conclusory in nature and wholly unsupported by the record. In fact, the record contains evidence to the contrary. A review of the record demonstrates that the Parole Commission gave due consideration to Yahweh Ben Yahweh's parole requests in prior hearings. For instance, at a hearing held on August 6, 1996, a parole examiner considered evidence of Yahweh Ben Yahweh's exemplary prison record, and evidence aimed at discrediting his conviction and sentence, but ultimately found that Yahweh Ben Yahweh should not be released on parole.[42] The examiner based this decision in part on his finding that Yahweh Ben Yahweh posed a risk to the community by virtue of his "strong influence on the members of his temple." When Yahweh Ben Yahweh appealed that decision, the United States Parole Commission upheld the denial of parole.[43] It noted that a "parole proceeding is not the proper venue in which to" challenge the evidence supporting the RICO conviction, and agreed that Yahweh Ben Yahweh posed a risk to the community.

Again on February 22, 2001, Yahweh Ben Yahweh requested that he be released on parole, this time on an emergency basis to join his ailing father.[44] The government opposed the release because it felt that he was still "a threat to the community." After Yahweh Ben Yahweh's father passed away, the Parole Commission denied the request, in part because the emergency had subsided, and in part because an immediate release "does not provide time for release planning." In short, the Parole Commission never summarily denied his requests; rather, it considered Yahweh Ben Yahweh's requests, evaluated his evidence as well as the evidence from the government, and provided reasons for denying the requests. Therefore, no bias or hostility can be said to have tainted the Parole Commission's determination that Yahweh Ben Yahweh poses a risk to the community.

Because Yahweh Ben Yahweh has not produced any evidence showing that the Parole Commission was biased, and because the underlying conviction amply supports the Parole Commission's determination, this Court finds that the Parole Commission, in imposing the parole conditions, sought to advance the compelling government interest of protecting the public from a parolee who has been determined to pose an *extreme* risk to the community. Having found that the Parole Commission has demonstrated a compelling government interest, the Court must next determine whether the Parole Commission has shown that the parole conditions are the least restrictive means capable of protecting that interest.

### c. The least restrictive means capable of protecting the compelling interest

Yahweh Ben Yahweh further argues that, even if the Parole Commission has shown a compelling government interest, these parole conditions are exceedingly broad, and cannot constitute the least restrictive means of protecting that compelling interest. The determination of whether the conditions are the least restrictive means capable of protecting the government's compelling interest entails an examination of the breadth of the conditions

---

42. Parole Commission Response, Exhibit C.

43. Parole Commission Response, Exhibit F.

44. Parole Commission Response, Exhibit G.

in light of the compelling interest, and a consideration of any less restrictive alternatives.

### 1. The breadth of the conditions

The contested parole conditions have been set forth verbatim above. They are certainly broad conditions, yet they are not necessarily overbroad. At first glance, they appear to prohibit Yahweh Ben Yahweh from engaging in any religious activity with his followers, living with his followers, working for his followers, or contacting or communicating with them by any means.[45] However, a more careful examination of the parole conditions reveals that Yahweh Ben Yahweh is not *absolutely* prohibited from engaging in these activities. Rather, each contested parole condition is tempered by the phrase, "without the prior written approval of your parole officer." [46] This caveat on the conditions is highly significant to an evaluation of their breadth. This phrase provides a great deal of flexibility and discretion as it has the potential to expand the scope of Yahweh Ben Yahweh's freedoms as he reintegrates into our community, and as his parole officer gains trust in his successful rehabilitation over the course of the parole period.

This Court simply will not assume, before the conditions are implemented, that the parole officer will arbitrarily and capriciously deny any request that might be made by Yahweh Ben Yahweh. As the Assistant United States Attorney noted at the hearing, the parole officer might, upon advance request, allow Yahweh Ben Yahweh to attend a wedding, or a funeral, or to join some other activity involving Nation

of Yahweh followers. The requirement of written permission simply ensures that the government will have advance notice of any association or communication by Yahweh Ben Yahweh with his followers, and an opportunity not to allow that contact if it poses an unacceptable risk to the community.

Granted, this advance permission requirement is, itself, a broad condition. However, if the requirement that Yahweh Ben Yahweh obtain advance permission before associating or communicating with any of his followers is the least restrictive means by which the safety of the public may be preserved, then it is not overbroad. Accordingly, the Court next turns to a consideration of whether less restrictive conditions could achieve that same interest.

### 2. Availability of less restrictive alternatives

Yahweh Ben Yahweh argues that the compelling government interest—protection of the public—would be satisfied by the imposition of less restrictive conditions. Specifically, he argues that no risk of harm would arise if he were permitted to live with his followers, be employed by them, more generally associate and communicate with them, and continue to broadcast his religious message through his website and his television program. If he is correct, the conditions are overbroad.

First, Yahweh Ben Yahweh posits that the conditions prohibiting these activities are necessarily too restrictive because he has been performing many of the activities without incident from within prison. For

---

**45.** The limitations on living with his followers and being employed by them have been included in the RFRA analysis because such activities could, conceivably, be considered an aspect of Yahweh Ben Yahweh's exercise of religion. This is because, at the height of the

religion, many followers worked exclusively for the Nation of Yahweh, and lived communally in the Temple. *See Beasley,* 72 F.3d at 1521.

**46.** Complaint, Exhibit A.

instance, he receives Nation of Yahweh visitors in prison, sends and receives correspondence to and from Nation of Yahweh followers in prison, runs his website from prison, and has broadcast a television program from prison. Therefore, he argues, more restrictive parole conditions that prohibit these seemingly innocuous activities must be overbroad.

The Court cannot agree. A parolee, no longer confined by prison walls and no longer subject to near-constant supervision, has more opportunity to violate the law or to incite violations of the law when he is outside of prison. Indeed, the activity of operating a religious website and television program, though harmless when performed from within the tightly-monitored prison system, could conceivably take on a dramatically different character when performed outside the reach of prison supervision. Similarly, written correspondence, which is often screened in prison, also may take on a different character when not screened by prison officials. Finally, Yahweh Ben Yahweh's receipt of visitors of the Nation of Yahweh faith in prison, where the visitors' names are recorded and the length of the visit limited, is an entirely different matter than his unsupervised association with Nation of Yahweh followers outside of prison. Unsupervised association could more easily result in precisely those ends the Parole Commission sought to prevent, such as recidivism or the incitement of violent acts. Therefore, a parole condition is not necessarily overbroad just because it prohibits activities that the parolee had safely performed within prison.

Second, Yahweh Ben Yahweh asserts that the conditions are more restrictive than necessary because he is not only prohibited from rejoining his co-conspirators or other convicted felons, but also is prohibited from rejoining the peaceful, law-abiding followers of the Nation of Yahweh. He argues that associating with peaceful, law-abiding followers would provide him with a safe and stable life that would advance his rehabilitation and reintegration into the community, and not pose a risk to the community. The Court, of course, agrees that there are followers of the Nation of Yahweh who are peaceful, law-abiding individuals—indeed, exemplary citizens. *See Beasley,* 72 F.3d at 1526. Furthermore, these exemplary citizens may very well be the individuals with whom Yahweh Ben Yahweh now seeks to associate. However, there are two problems with indiscriminately allowing such association.

First, the Court, and presumably the Parole Commission, cannot contemplate any less restrictive means of prohibiting association with the criminal factions of the Nation of Yahweh. There is no readily apparent mechanism for distinguishing the peaceful, law-abiding followers from those who are not peaceful, and not law-abiding. In part because of this problem of distinguishing law-abiding members from non-law-abiding members, courts have repeatedly upheld parole conditions that restrict association with entire criminal enterprises, even when those enterprises may have legitimate purposes and law-abiding members.[47] For example, in *Malone v. United States,* 502 F.2d 554 (9th Cir.1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975), an individual convicted of exporting firearms to the Irish Republican Army challenged pa-

---

**47.** While the conviction here was not based on the prosecution of a religion, and while the Nation of Yahweh was not itself convicted, the Nation was named as the criminal enterprise through which the crimes were committed. *See Beasley,* 72 F.3d at 1525 ("Substantial legal precedent permits a wide range of legitimate enterprises to be named as the vehicle through which racketeering acts are committed.").

role conditions that required that he "(1) not participate in any American Irish Republican movement; (2) belong to no Irish organizations, cultural or otherwise; (3) not visit any Irish pub; and (4) accept no employment that directly or indirectly associates him with any Irish organization or movement." *Id.* at 555.[48] The Ninth Circuit upheld these conditions. *Id.* at 557. Admittedly, the legal analysis employed in these cases was not based on RFRA, which demands strict scrutiny. Nevertheless, these cases demonstrate that such conditions are not entirely foreign to the parole system. More precisely, even under RFRA, such conditions may be allowed. if they are no broader than necessary to achieve the compelling interest of the Parole Commission.

The second and probably more important problem with indiscriminately allowing Yahweh Ben Yahweh to associate with Nation of Yahweh followers lies in the control that Yahweh Ben Yahweh has been found capable of wielding over them. For instance, the Parole Commission concluded, after the August 6, 1996 hearing, that Yahweh Ben Yahweh "appears to have had complete control of his members." [49] This finding is supported by his conviction and the Eleventh Circuit's opinion in *Beasley*, 72 F.3d at 1527. In an ideal world, the Court would prefer to believe that Yahweh Ben Yahweh would not incite peaceful, law-abiding citizens to commit acts of violence; in the real world, the fact remains that he is currently serving a federal sentence for doing precisely that.

Consequently, this Court finds that less restrictive conditions may fail to achieve the compelling and legitimate government interest of rehabilitation and protection of the public. The Parole Commission need not wait for harm to occur before awakening to its responsibility of protecting the community. Therefore, the parole conditions survive RFRA strict scrutiny, and this Court concludes that Yahweh Ben Yahweh has failed to show a likelihood of success on his RFRA claim.

### d. The unique circumstances of parole

Notably, were it not for the fact of the underlying conviction, and the fact that Yahweh Ben Yahweh's sentence is seven years from being fully-served, this case would take on an entirely different character, and in all likelihood, end in a different result. Because this Court's decision depends partially on the special circumstances of the parole environment, the RFRA analysis is best concluded with a recognition of those special circumstances. *See Lawson v. Singletary*, 85 F.3d at 509–11; *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

The Supreme Court has observed that parole "conditions restrict [parolees'] activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." *Morrissey v. Brewer*, 408 U.S. 471, 478, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Court further described the "function of parole in the correctional process," observing that, "[r]ather than being an ad hoc exercise of clemency, parole is an established variation on imprisonment of convicted criminals." *Id.* at 477, 92 S.Ct. 2593. Finally, parole conditions are

---

**48.** *See also United States v. Showalter*, 933 F.2d 573, 574–76 (7th Cir.1991) (upholding condition of supervised release that prohibited defendant, convicted of possession of unregistered firearm, from associating with other skinheads and neo-Nazis); *United States v. Schiff*, 876 F.2d 272, 276–277 (2d Cir.1989) (upholding special release conditions imposed on individual convicted of tax evasion that prohibited him from associating with organizations advocating violation of or noncompliance with tax laws).

**49.** Parole Commission Response, Exhibit C.

not of indefinite duration; they terminate at the expiration of the sentence, or, in the case of mandatory release, one hundred and eighty days prior to the expiration of the sentence.[50] Therefore, in Yahweh Ben Yahweh's case, these parole conditions may extend only to the year 2008.

This is not to say that parole officers have free reign in controlling the lives of parolees. Rather, under the RFRA, those parole decisions that substantially burden the exercise of religion must still stand up to strict scrutiny by the judiciary, as the conditions in this case have. However, that strict scrutiny is performed with awareness of the unique circumstances of parole—the unique circumstance being that a parolee has been duly convicted and sentenced, and has not yet fully served that sentence. Because of this circumstance, the parolee is not in the same position vis a vis the government as an innocent citizen is. In other words, under RFRA, the government may reach its hand farther into the religious freedoms of a parolee than of an innocent citizen, as long as the government has a compelling and legitimate interest in doing so, and reaches no farther than it must.

## IV. Applying the First Amendment test

■ Having found that the parole conditions satisfy the RFRA strict scrutiny test, the Court need not belabor its discussion of the constitutionality of the conditions under the less-demanding First Amendment test. As already discussed, courts have repeatedly used the less onerous "reasonably related" test to evaluate challenges to parole conditions that burden protected rights. *See, e.g., United States v. Smith,* 618 F.2d 280, 282 (5th Cir.1980); *United States v. Schave,* 186 F.3d 839, 843 (7th Cir.1999) (holding that "a court will not strike down conditions of release, even

if they implicate fundamental rights, if such conditions are reasonably related to the ends of rehabilitation and protection of the public from recidivism"); *United States v. Terrigno,* 838 F.2d 371, 374 (9th Cir.1988) (same). In other words, conditions that burden a parolee's First Amendment rights to freedom of religion, freedom of speech, or freedom of association must be "reasonably related" to the legitimate purposes of parole.

Because this Court has found that the Parole Commission's purpose was the protection of a compelling government interest, and that these conditions are the least restrictive means by which the government can protect that interest, the parole conditions are necessarily "reasonably related" to legitimate parole purposes. Therefore, the parole conditions are constitutional under the First Amendment, and Yahweh Ben Yahweh has not shown a likelihood of success on his First Amendment claims.

### a. Threats to Yahweh Ben Yahweh

■ The Court pauses to note that Yahweh Ben Yahweh has alleged that the parole conditions are unconstitutional because the deprivation of his right to freedom of association puts his life in jeopardy. Specifically, Yahweh Ben Yahweh argues that, without the protection of his followers, he could be assassinated. This allegation was not considered in the RFRA analysis because, while there are many aspects to the free exercise of religion, the right to receive physical protection from fellow believers is generally not one of them. However, this burden could be relevant to Yahweh Ben Yahweh's freedom of association claim, and thus, is briefly evaluated here.

At the preliminary injunction hearing, several alleged threats against Yahweh

**50.** *See* 18 U.S.C. § 4164.

Ben Yahweh were admitted into evidence. The exhibits were: (1) a letter to Yahweh Ben Yahweh from a woman who was not permitted to see him in prison, and who wrote that she would give him "an asskicking"; [51] (2) a short audio tape of a message left on the Nation of Yahweh answering service in which the unidentified speaker uses profanity and says he is going to assassinate Yahweh Ben Yahweh; [52] (3) a brief email from "Erik Mikealson," who wrote that Yahweh Ben Yahweh should "watch those blasphemous, Masonic terminologies you all use lest you feel a TRUE Hebrew sword and get cut off"; [53] (4) an envelope, which allegedly disclosed the possible locations the Parole Commission was considering to place Yahweh Ben Yahweh before either he or his attorney knew of them, and contained the words "Prince Hall, Egypt, shall pay"; [54] and finally, (5) a letter to the prison warden from the United States Probation Office in the Eastern District of Oklahoma, indicating its objection to Yahweh Ben Yahweh residing in Oklahoma, and discussing the risk to his personal safety because of the "Caucasian, *traditional* Christian individuals" who reside in Oklahoma.[55]

While some of these exhibits are threatening, others are less clear. Specifically, the recorded message and the e-mail certainly may be considered possible threats. However, the letter is more in the nature of a letter from a spurned acquaintance than from a potential assassin. Also, the envelope may be characterized as hostile, but is too vague to be construed as an assassination threat. Finally, the letter to the prison warden, discussing the hostility of Oklahomans, is irrelevant to his safety as Yahweh Ben Yahweh will be living in Miami.

Regardless, the Court cannot conclude that Yahweh Ben Yahweh's right to associate, and thus to receive physical protection from his followers, trumps the Parole Commission's duty to protect the public. Association with his followers is not the only way, or probably even the safest way, for Yahweh Ben Yahweh to protect himself. Rather, he should keep his parole officer informed of any threats he receives, and seek protection from the police and other authorities to the extent it is necessary.

## V.   Denial of the Motion for Preliminary Injunction

In summary, Yahweh Ben Yahweh is not entitled to preliminary injunctive relief because he has not shown a likelihood of success on the merits of either his claim under the RFRA or his claim under the First Amendment. He has failed to show a likelihood of success under RFRA because, even though he has shown a substantial burden on his exercise of religion, the government has shown that it is protecting a compelling interest and is using the least restrictive means available to protect that interest. *See* 42 U.S.C. § 2000bb–1; *see also Gibson,* 223 F.3d at 1258; *Fawaad,* 81 F.3d at 1086–87; *Gunning,* 3 F.Supp.2d at 1433. He has failed to show a likelihood of success on his First Amendment claim because the parole conditions are reasonably related to the legitimate purposes of parole. *See Smith,* 618 F.2d at 282. Therefore, his motion for preliminary injunction must be denied.

## G.   *PRELIMINARY INJUNCTION BY DEFAULT*

Having found that Yahweh Ben Yahweh has not shown a likelihood of success on

---

**51.**   Hearing, Exhibit A.

**52.**   Hearing, Exhibit B.

**53.**   Hearing, Exhibit C.

**54.**   Hearing, Exhibit D.

**55.**   Hearing, Exhibit E.

the merits, and is not entitled to a preliminary injunction, it would clearly be inappropriate to grant Yahweh Ben Yahweh's motion for preliminary injunction by default, regardless of whether the Parole Commission's response was timely filed.

## H. *CONCLUSION*

ACCORDINGLY, it is

ORDERED AND ADJUDGED as follows:

1. Defendant's Motion to Dismiss is DENIED.

2. Plaintiff's Motion for Preliminary Injunction is DENIED.

3. Plaintiff's Motion for Preliminary Injunction by Default is DENIED.